*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0239P (6th Cir.)
File Name: 00a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAVID RUTLIN,
    *Plaintiff-Appellant,*

    *v.*

No. 99-1042

PRIME SUCCESSION, INC.;
KERLEY & STARKS FUNERAL
HOMES, INC., jointly and
severally,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 97-00868—David W. McKeague, District Judge.

Argued: March 17, 2000

Decided and Filed: July 20, 2000

Before: NORRIS, MOORE, and COLE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** John T. Burhans, LAW OFFICE OF JOHN T. BURHANS, St. Joseph, Michigan, for Appellant. Stephen B. Mead, ROSS & HARDIES, Chicago, Illinois, for Appellees. Roger Wilkinson, U.S. DEPARTMENT OF LABOR,

1

OFFICE OF THE SOLICITOR, Washington, D.C., for Amicus Curiae. **ON BRIEF:** John T. Burhans, LAW OFFICE OF JOHN T. BURHANS, St. Joseph, Michigan, for Appellant. Stephen B. Mead, ROSS & HARDIES, Chicago, Illinois, for Appellees. Roger Wilkinson, Paul Frieden, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Amicus Curiae.

COLE, J., delivered the opinion of the court, in which NORRIS, J., joined. MOORE, J. (pp. 15-29), delivered a separate dissenting opinion.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. David Rutlin, a licensed funeral director and embalmer, filed this action against his former employer under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq., claiming that he was not compensated for his overtime services and on-call time. The district court granted partial summary judgment to each party, finding, inter alia, that Rutlin was a professional and, therefore, exempt from the overtime requirements of the FLSA. The district court further found that Rutlin's on-call time was not so restrictive as to require compensation. For the reasons that follow, we **AFFIRM** in part and **REVERSE** in part, and **REMAND** to the district court for further proceedings in accordance with this opinion.

### I.

From 1968 until 1997, Rutlin was employed by Kerley & Starks Funeral Homes, Inc. and its successor, Prime Succession, Inc. ("Prime Succession"), as a licensed funeral director and embalmer. In order to become a licensed funeral director in Michigan, Rutlin was required to complete a year of mortuary science instruction and two years of college, including classes in chemistry and psychology; pass national board tests that covered embalming, pathology, anatomy, and

cosmetology; practice as an apprentice for one year; and pass an examination given by the state. *See* MICH. COMP. LAWS § 339.1806. Rutlin's job responsibilities included embalming bodies and preparing them for funerals, counseling families, directing funerals, and supervising burials. Rutlin also did chores such as receiving and directing flower deliveries, arranging for newspaper notices, mowing the lawn, and cleaning the funeral home.

From 1985 to 1997, Prime Succession paid Rutlin under five different salary arrangements. The district court described the five periods as follows:

1) From November 1974 to February 1995 ("Period I"), plaintiff was paid a salary of $1623.00 every two weeks with no overtime.

2) From February 1995 to March 1996 ("Period II"), plaintiff was paid on a "fluctuating workweek" plan. Under this plan, plaintiff received $1540.00 every two weeks and some overtime (one-half plaintiff's regular rate) for every hour worked over forty per week. Plaintiff's regular rate for any given week was calculated by dividing his fixed salary by the number of hours worked that week.

3) From March 1996 to December 1996 ("Period III"), plaintiff was paid on a "guaranteed workweek" plan. Under this plan, plaintiff received $1750.00 every two weeks for all hours worked up to and including sixty hours, and overtime at one and one-half his regular rate for hours worked over sixty per week.

4) From January 1997 to [m]id-April 1997 ("Period IV"), plaintiff was paid a salary of $1750.00 every two weeks without overtime.

5) From [m]id-April 1997 to October 1997 ("Period V"), plaintiff was paid on an hourly basis with overtime at one and one-half times his regular rate for hours worked over forty per week.

*Rutlin v. Prime Succession, Inc.,* 29 F. Supp. 2d 794, 796 (W.D. Mich 1998) (footnote omitted).

As one of three funeral directors employed by Prime Succession, Rutlin was required to be on call during certain nights and weekends. When Rutlin was on call, Prime Succession's phone line was transferred to his home, where he was responsible for answering calls. This duty was rotated, such that for two weeks Rutlin would be on call two week nights from 5 p.m. to 8 a.m., and the third week he would be on call over the weekend, from 5 p.m. Friday to 8 a.m. Monday.

In August 1997, Rutlin filed a complaint in Michigan state court, claiming that he was denied overtime pay and on-call compensation in violation of the FLSA, the Michigan Wages and Fringe Benefits Act (WFBA), MICH. COMP. LAWS §§ 408.471 et seq., and Michigan contract law. Prime Succession removed the case to federal court in October 1997; both parties then filed motions for summary judgment. On December 3, 1998, the district court granted partial summary judgment to each party.

The district court found that Rutlin was a professional employee during pay periods I through IV and, therefore, exempt from the FLSA's overtime provisions. Accordingly, the district court granted Prime Succession's motion for summary judgment for pay periods I through IV. With respect to pay period V, the district court granted summary judgment in favor of Rutlin, finding that he was not a professional during that time because he was not paid on a salary basis. The district court thus held that Rutlin was entitled to overtime pay for pay period V.

As for on-call compensation, the district court granted summary judgment in favor of Prime Succession, finding that Rutlin's on-call time was not so restrictive as to require pay. The district court stated:

Plaintiff admits that he could usually swap on call schedules with another funeral director in order to

Finally, I believe that the district court should have considered the extent of the benefit that the employer received from Rutlin's on-call time. Given the high number of calls that Rutlin received each night of his on-call duty, an important inquiry would have been whether and how much Rutlin's employer would have had to pay others to perform these services — in other words, whether the employer was receiving necessary labor for free. *See Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 64-66 (2d Cir. 1997) (examining the benefits to the employer for a claim for mealtime compensation); *see also* Eric Phillips, *On-Call Time Under The Fair Labor Standards Act*, 95 MICH. L. REV. 2633, 2644-46 (1997).

### III.

For the foregoing reasons, I would reverse the district court's partial grant of summary judgment on Rutlin's claims for overtime pay and on-call time compensation, and I would remand the case to the district court for further proceedings in accordance with this dissent.

of two choices if he wished to participate in private activities outside of his home: (1) have his wife answer the phone so that she could page him, which would in effect prevent him from engaging in any activities with her;[7] or (2) similarly inconvenience another funeral director by having him answer the phone calls that were forwarded from the funeral home and then page Rutlin on the pager.

Additionally, Rutlin has raised a genuine issue of material fact regarding whether his responsibilities for "death calls" left him "engaged to wait" and thus unable to use his on-call time effectively for personal pursuits. Rutlin testified that he received a "death call," for which he had to remove and transport bodies to the funeral home, at least once a week. J.A. at 662. If a death call involved removing the body from a home, Rutlin had to contact the family immediately for a removal. J.A. at 662. In most cases, bodies were removed from homes within forty-five minutes to an hour from the call. J.A. at 619. If a death call involved a removal from a nursing home or hospital, Rutlin could wait until the morning (unless the call occurred in the morning) to remove the body; however, Rutlin had to adhere to the funeral home's strict rule requiring that all embalmings, each which usually took about two hours, be completed by 8:00 a.m. J.A. at 662, 682. Thus, Rutlin was often compelled to finish each embalming directly after a death call and removal.[8] J.A. at 662, 682. All of these facts together raise questions as to whether the potential for "death calls" and the unpredictability of these calls made effective, personal use of Rutlin's on-call time impractical.

---

[7] It appears that no other family member or friend was allowed to answer the calls directed from the funeral home to forward them to Rutlin, as Rutlin had previously been reprimanded for allowing his cousin to answer the funeral home line in his apartment to forward calls to him. J.A. at 343, 695.

[8] For each death call, Rutlin was paid for his work from the time that he picked up the hearse at the funeral home to the time that he brought the body to the home or finished embalming the body. J.A. at 662-63.

---

accommodate his plans, and that he could forward the phones and be reached by a pager if he had to leave home while on call. Plaintiff states that on average he received between 15 and 20 phone calls a night, taking up about one hour of his time, while he was on call. Sometimes plaintiff would be required to make other phone calls in response to the calls he received. Also, plaintiff received, on average, one "death call" per week. A death call required the plaintiff to leave home, pick up the hearse, remove the body, and return the body to the funeral home. Plaintiff clocked in and out, and was compensated, for the time he spent on a death call. Finally, plaintiff stated that he was able to engage in personal activities while on call, including watching television, computing, talking on the phone with friends and family, engaging in activities with his wife, and going out to dinner. Given these facts, it is apparent to the Court that plaintiff's on call time was not "so onerous" as to prevent him from engaging in personal pursuits. Plaintiff had flexibility in his on call schedule, and the ability to leave his home. The phone calls plaintiff received, though fairly frequent, rarely involved calls to duty, or death calls. Finally, plaintiff was able to engage in a significant number of personal pursuits while on call. For these reasons, the Court finds that plaintiff's on call time is not compensable under the FLSA.

*Rutlin,* 29 F. Supp. 2d at 799-800 (citation omitted).

In regard to Rutlin's WFBA claims, the court granted summary judgment to Prime Succession for pay periods I through IV, based on the fact that the WFBA does not create an independent right to overtime pay. The court did not grant summary judgment to either party for pay period V on Rutlin's WFBA claim.

Finally, the district court addressed Rutlin's state contract law claims. The court found no evidence that Rutlin understood he was entitled to overtime pay for periods I through IV, but found there was a contract for overtime pay

during period V.    The district court granted summary judgment to Rutlin for this time period.

The parties then stipulated that the WFBA claim for Period V would be dismissed, to enable Rutlin to appeal to this court. Rutlin now appeals the adverse rulings of the district court. The Secretary of Labor has filed a brief as amicus curiae in support of Rutlin.

## II.

We review a district court's grant of summary judgment de novo. *See Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996). The decision to deny a motion for summary judgment, while ordinarily reviewed for abuse of discretion, is reviewed de novo when it is based on the resolution of a legal issue rather than on the presence of a material issue of fact for trial. *See Douglas v. Argo-Tech Corp.,* 113 F.3d 67, 70 (6th Cir. 1997). Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).   We view the evidence in the light most favorable to the non-moving party. *See Birgel v. Board of Comm'rs*, 125 F.3d 948, 950 (6th Cir. 1997).

## III.

### A.

Rutlin contests the district court's finding that he was a professional and, therefore, not entitled to overtime compensation under the FLSA for pay periods I through IV.

The FLSA requires an employer to compensate an employee who works over forty hours a week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  There is an exemption from the overtime pay requirement, however, for those employed in a "bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1).  This exemption is "narrowly construed against the employers

down, trying to eat, and I'd have two or three phone calls during dinner." J.A. at 661.[5]

I also think that the frequency of these calls raises questions as to Rutlin's geographical restrictions, in particular his ability to leave his house freely without burdensome interruptions.[6]  The majority states that the fact the funeral home gave Rutlin a pager indicates that he was free to engage in personal activities.  Rutlin began to work at the funeral home in 1969, however, and did not receive this pager until the early 1990s.  J.A. at 660.  Because I believe that Rutlin does not satisfy the criteria for the professional exemption, I believe that there is at least a question as to whether Rutlin was free to engage in personal activities before he received the pager in the early 1990s.  As Rutlin testified during his deposition, "[B]efore I had a pager, I usually stayed at home. . . . It was my duty to answer the phones.  I could get someone else to answer the phones and tell them where I would be, but I would have to check in with them every half hour." J.A. at 661.  Certainly, if Rutlin had to call regularly and check in with someone every half hour when he left his home during on-call duty, he could not take part in simple events, such as going to a movie or a play, without having to worry about interruptions due to customer calls.  Moreover, I believe that there is an issue of fact regarding whether Rutlin could freely engage in personal activities even with a pager. Rutlin's wife, Evelyn Clare Rutlin, testified that even with a pager "[s]omeone had to answer the phone to be able to page" her husband if he was out of the house.  J.A. at 695. Therefore, even with the use of a pager, Rutlin had only one

---

[5]The calls also appear to have restricted the personal time of Rutlin's wife, who had to answer the funeral home line in their apartment on his on-call duty days until he arrived home and while he was out on a death call.  J.A. at 343, 696.

[6]Rutlin stated that the manager of the funeral home called and told him to return home from a wedding reception that he was attending one night when Rutlin had forwarded calls to another funeral home.  J.A. at 344.

firefighters were required to report to a callback within twenty minutes, and could be subject to discipline for not answering. *Renfro*, 948 F.2d at 1537-38; *see also Cross*, 938 F.2d at 916-17 (finding a genuine issue of material fact as to whether on-time call was compensable because the employees were confined to a limited area and the on-call time significantly interfered with their private activities with family and friends and common activities like watching television or reading). On the other hand, other courts have found that on-call time was not compensable. For example, in *Martin*, we found that the on-call time of turnpike employees was not compensable because the employees could wear a beeper during their on-call duty or leave word where they could be located and therefore were not significantly restricted by on-call policies. *Martin*, 968 F.2d at 611-12; *see also Ingram*, 144 F.3d at 268-70 (finding that the on-call time of deputy sheriffs was not compensable because the deputies could carry a beeper or leave word where they may be reached, did not receive calls frequently while on call, were not required to report within a fixed amount of time, and could trade on-call shifts with each other).

I believe that the facts in Rutlin's case fall somewhere between *Renfro* and *Cross*, in which the on-call time of the plaintiffs was held to be compensable, and *Martin* and *Ingram*, in which the employees' on-call time was found not to be compensable. In my opinion, Rutlin has raised a genuine issue of material fact as to whether the number of phone calls he received during his nights on-call were so burdensome that he was "engaged to wait" for them. *Skidmore*, 323 U.S. at 137. Rutlin testified that he received fifteen to twenty phone calls per night while on-call (including calls forwarded from other funeral homes), with each call lasting for a few minutes and sometimes requiring follow-up. J.A. at 661. He further testified that the phone calls were often so frequent that he could not enjoy private, personal activities, such as family dinners. For instance, Rutlin testified, "It was a busy line. I remember trying to eat and having to jump up and handle a phone call, sit back

seeking to assert [it]." *Douglas*, 113 F.3d at 70 (citation and quotation omitted). The employer bears the burden of proving that an employee fits into the exemption. *See id.* The determination of whether a plaintiff is a professional is "intensely fact bound and case specific." *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996).

Congress did not define the phrase "bona fide executive, administrative, or professional capacity" in the FLSA; instead, it delegated to the Secretary of Labor the responsibility of promulgating regulations to define the scope of the section at issue. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.2. The Secretary's regulations must be given controlling weight unless those regulations are found to be "arbitrary, capricious, or manifestly contrary to the statute." *Freeman v. National Broad. Co.,* 80 F.3d 78, 82 (2d Cir. 1996).

With respect to determining whether the exemption for overtime pay applies because an employee is a professional, the implementing regulations of the FLSA set out a "long test" and a "short test." The short test applies to employees who are paid "on a salary or fee basis at a rate of not less than $250 per week." 29 C.F.R. § 541.2(e)(2). Here, the parties do not dispute the fact that the short test applies to this case. Under the short test, Prime Succession must prove that: 1) it paid Rutlin on a salary or fee basis; 2) Rutlin's work required "knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes," 29 C.F.R. § 541.3(a); and 3) Rutlin's job duties required him to customarily and regularly exercise discretion and independent judgment. *See Owsley v. San Antonio Indep. Sch. Dist.,* 187 F.3d 521, 524 (5th Cir. 1999), *cert. denied,* 120 S. Ct. 1423 (2000); *cf. Douglas*, 113 F.3d at 70-71 (citing 29 C.F.R. § 541.2(a)(1), (e)(2) in applying the exception for administrative employees).

We are aware of only one circuit court that has faced the issue of whether a licensed funeral director and embalmer is a professional under the FLSA. In an unpublished decision, the Seventh Circuit affirmed a district court's finding that a licensed funeral director and embalmer was a professional, noting that the employee often operated the funeral home alone in the absence of the owner, and that embalming required independent judgment and discretion. *See Szarnych v. Theis-Gorski Funeral Home, Inc.*, No. 97-3069, 1998 WL 382891, at *1 (7th Cir. June 4, 1998).

Turning to other occupations, the Fifth Circuit has held that athletic trainers are professionals, in light of Texas' requirement that trainers obtain a bachelor's degree in any field, but also must take certain courses such as anatomy and physiology, perform a three-year apprenticeship, and obtain CPR certification. *See Owsley*, 187 F.3d at 525; *see also Reich v. Wyoming*, 993 F.2d 739, 743 (10th Cir. 1993) (finding game wardens to be professionals, stating: "In order to accomplish the tasks associated with wildlife management, the wardens must have particular knowledge of various species and their habitats as well as the vegetation and general terrain within their districts. A degree in wildlife management or biology or similar field provides the wardens with this requisite knowledge."). *But see Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1566 (11th Cir. 1991) (holding that a probation officer not a professional because the job did not require an advanced degree in a specialized field of knowledge).

In the present case, there is no argument regarding whether Prime Succession can establish the first prong of the short test for establishing that Rutlin was a professional: Prime Succession paid Rutlin on a salaried basis for pay periods I through IV.

As for the second prong of the short test, Prime Succession must show that Rutlin's work required "knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual

We previously held in *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606 (6th Cir. 1992), that "on-call time spent at home may be compensable if the restrictions imposed are so onerous as to prevent employees from effectively using the time for personal pursuits." *Id.* at 611; *see also* 29 C.F.R. § 785.17 (noting that on-call time is compensable where the employee "cannot use the time effectively for his own purposes"). In making determinations regarding the availability of on-call time compensation, courts have weighed numerous factors in these fact-intensive decisions, including (1) the frequency of the calls to the on-call employee; (2) geographical restrictions on the employee's movements; (3) the restrictiveness of fixed time limits for response; (4) the threat of discipline in the event of a late or no response from the on-call employee; (5) the on-call employee's ability to trade his responsibilities with another employee; (6) the on-call employee's actual pursuit of or engagement in personal activities; and (7) the benefit of the on-call time to the employer. *See, e.g., id.* at 611-12; *see also Skidmore*, 323 U.S. at 137; *Ingram v. County of Bucks*, 144 F.3d 265, 268 (3d Cir. 1998); *Renfro v. City of Emporia*, 948 F.2d 1529, 1537-38 (10th Cir. 1991); *Cross v. Arkansas Forestry Comm'n*, 938 F.2d 912, 916-17 (8th Cir. 1991); *Norton v. Worthen Van Serv., Inc.*, 839 F.2d 653, 654-56 (10th Cir. 1988). *Cf.* Eric Phillips, *On-Call Time Under The Fair Labor Standards Act*, 95 MICH. L. REV. 2633 (1997) (suggesting methods for clarifying the analysis in determining whether an employee is working while on call). Any combination of these "[f]acts may show that the employee *was engaged to wait*, or they may show that he *waited to be engaged*." *Skidmore*, 323 U.S. at 137 (emphasis added).

In balancing these factors, some courts have found that the on-call time of employees was compensable. For example, in *Renfro*, the Tenth Circuit found that, in spite of firefighters' participation in sports and social activities with family and friends while on call, the on-call time of these firefighters was compensable because the frequency of calls, an average of three to five times a day, significantly restricted their personal schedules to the benefit of the employer and because the

with respect to Rutlin's organizing, directing, and supervising funerals, the tasks involved with these duties were not of the sort requiring the application of "special knowledge or talents with discretion and judgment." 29 C.F.R. § 541.305(b). For instance, when Rutlin was organizing funerals, he merely followed the procedures set forth by the funeral home. He had no discretion to set prices or arrangements for funerals and was required to follow the funeral home's rules on scheduling funerals. As for the actual supervising of funerals, Rutlin performed only rote tasks that required no significant exercise of discretion or judgment. Such routines included going to the church one hour before the service, transporting the body, setting up flowers, greeting people, escorting the family to the gravesite, and seating the family at the gravesite. J.A. at 624, 629-30. Lastly, with regard to counseling families, Rutlin testified that his "counseling" of families consisted solely of his helping the family set a time for the service and visitation, explaining different options for funeral arrangements, giving the families a price list set by the funeral home for its services, encouraging the families to make decisions on pertinent matters, and empathizing with them. J.A. at 622-24.

In sum, in my view, Rutlin neither possessed the education of a professional, nor performed work that required "the consistent exercise of discretion and judgment in its performance." 29 C.F.R. §§ 541.3, 541.305. Therefore, he does not fit within the professional exemption.

## II.

With regard to Rutlin's claim for compensation for on-call time, the majority holds that Rutlin is entitled to be compensated solely for the time he actually spent in answering the fifteen to twenty calls per night that were forwarded from the funeral home to his house. Because I am convinced that there are genuine issues of material fact as to whether Rutlin's full on-call time was compensable, I dissent from the majority's holding.

instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes." 29 C.F.R. § 541.3(a). The FLSA regulations further explain that the word "customarily" implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession. *See* 29 C.F.R. § 541.302(d). The Secretary's interpretations recognize that "[t]he areas in which professional exemptions may be available are expanding," 29 C.F.R. § 541.301(e)(2), but, "[g]enerally speaking . . . include law, medicine, nursing, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical, and biological sciences, including pharmacy and registered or certified medical technology and so forth," 29 C.F.R. § 541.301(e)(1).

Here, the district court found that plaintiff's work required knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as required by federal regulations:

> As a funeral director and embalmer, plaintiff had to be licensed by the state. In order to become licensed, plaintiff had to complete a year of mortuary science school and two years of college, including classes such as chemistry and psychology, take national board tests covering embalming, pathology, anatomy, and cosmetology, practice as an apprentice for one year, and pass an examination given by the state.

*Rutlin,* 29 F. Supp. 2d at 798.

We agree with the district court. Rutlin completed a specialized course of instruction directly relating to his primary duty of embalming human remains. The fact that Rutlin was not required to obtain a bachelor's degree fails to persuade us otherwise. The FLSA regulations do not require that an exempt professional hold a bachelor's degree; rather, the regulations require that the duties of a professional entail advanced, specialized knowledge. We conclude that a

licensed funeral director and embalmer must have advanced, specialized knowledge in order to perform his duties.

Rutlin argues, however, that even if a licensed funeral director and embalmer's duties are considered professional, he spent only fifteen hours a week actually embalming bodies and directing funerals. Rutlin thus contends that his *primary duties* were not professional because those duties consisted of general upkeep of the funeral home. The district court disagreed, finding that even if Rutlin's other, non-professional duties took more than fifty percent of his working time, his professional duties were of principal importance to Prime Succession and, therefore, constituted his primary duties.

Again, we agree with the district court. Although the amount of time an employee spends in the performance of particular tasks is a useful guide to determining that employee's primary duty, *see* 29 C.F.R. § 541.103, "courts evaluate whether an employee's responsibilities constitute his primary duty based on the importance of the duties, the frequency with which they require the employee to exercise discretion, and the relative freedom of the employee from supervision, as well as the percentage of time the employee spends performing them," *Piscione v. Ernst & Young,*, 171 F.3d 527, 545 (7th Cir. 1999). Here, it is clear that Rutlin's duties that were of principal importance to Prime Succession were those related to directing funerals and embalming bodies. Accordingly, these were Rutlin's primary duties. The fact that Rutlin performed collateral tasks, even if those tasks took more time than his primary duties, does not change this fact. *See Reich,* 993 F2d at 742.

Turning to the third prong of the short test for determining whether Rutlin is an exempt professional, we must consider whether Rutlin's job required that he exercise discretion and independent judgment. In this respect, the district court found:

> This claim is supported by the nature of plaintiff's duties, including counseling grieving families, and removing, embalming and cosmetizing bodies, and by the fact that

In *Hashop*, the district court held that, although the NCS Instructors used their advanced training and experience to make decisions during simulated missions, they were allowed to make such decisions only within a well-defined framework. *Hashop*, 867 F. Supp. at 1298-99. Although the instructors could make technical recommendations within the framework of the simulation scripts, they had no discretion to change how or when simulations were operated or to modify them in any other way. *Id*. Thus, they did not satisfy the third prong of the short test.[4] Similarly, in *Quirk*, the district court held that the paramedics lacked the requisite authority to exercise discretion and judgment because they were required to respond to strict protocols that were established by physicians and could be disciplined for failing to follow the protocols. *Quirk*, 895 F. Supp. at 785-86; *see also Brennan v. South Davis Community Hosp.*, 538 F.2d 859, 864 (10th Cir. 1976) (finding that the chief x-ray technician was not within the professional exemption because his decisions were limited to determining if the pictures were technically adequate and his work was not predominantly intellectual and varied as required by 29 C.F.R § 541.3); *Debejian*, 64 F. Supp. 2d at 89-90 (finding that a NDT Technician's work was not of a professional nature because it primarily involved "utilizing various tools to ascertain whether the subject steel conforms to industry and/or project standards," not interpreting the data or deviating from established standards).

In this case, like the plaintiffs in *Hashop* and *Quirk*, Rutlin did not have any real discretion in performing his required tasks as a funeral director. First, with regard to Rutlin's duties in supervising and coordinating the removal of bodies from residences, hospitals, and nursing homes, Rutlin simply followed company policy, which required that a funeral director be present when a body is being removed from a home to answer the questions of the family and to set up a time to make final arrangements. J.A. at 619-20. Second,

---

[4] The court noted that there was "no meaningful distinction between such activities and those that would be performed by a highly trained technician." *Hashop*, 867 F. Supp. at 1298.

deceased, the majority concludes that Rutlin's decisions to make these adjustments demonstrates that his job as a funeral director required the exercise of discretion and judgment normally used by professionals. A review of Rutlin's decisions in the embalming process, however, reveals the exact opposite. Rutlin's decisions regarding how much fluid and which fluids to use when embalming individual dead persons and his decisions regarding whether additional arteries needed to be raised to inject fluid into particular bodies involved nothing more than his assessments in determining the best methods for performing the routine task of preserving the dead bodies through chemical injections. In other words, these decisions simply addressed how Rutlin planned to apply a technical skill to perform the routine task of embalming individual bodies. Indeed, Rutlin testified that the techniques he used to embalm bodies were routine, that they had not changed in thirty years, and that he could "do much of [the] work without even looking at the body." J.A. at 683-84.[3]    And as the regulations provide, "[p]urely mechanical or routine work is not professional." 29 C.F.R. § 541.305(b).

In essence, Rutlin's application of his embalming skills was comparable to that of the Network Communication Systems ("NCS") Instructors, who trained Space Shuttle ground control personnel during simulated missions, in *Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287 (S.D. Tex. 1994), and that of the paramedics in *Quirk*, who were required to follow protocols. *See Quirk*, 895 F. Supp. at 786. In both *Hashop* and *Quirk*, the application of skills learned through technical training to the job did not constitute the exercise of the type of discretion and judgment contemplated by the FLSA regulations.

---

[3] Additionally, many of the other functions that Rutlin performed as funeral director, such as counseling families or removing bodies from hospitals and nursing homes, could be performed by non-licensed persons. J.A. at 85, 87.

plaintiff was often unsupervised in those duties. While plaintiff gained expertise in his work over the course of his employment, such expertise does not change the professional nature of plaintiff's work, or eliminate the discretion and judgment plaintiff exercised in performing his duties.

Rutlin contends that embalming is "routine and contained within well-defined parameters." He asserts that the techniques of embalming have changed very little over the past thirty years, and notes that Michigan has no continuing education requirement for his profession. Prime Succession, on the other hand, claims that several of Rutlin's responsibilities, such as removing bodies, counseling families, arranging funerals and visitations, cosmetizing bodies, and the actual embalming process, require discretion and judgment. Prime Succession further claims that Rutlin was unsupervised in performing these duties and that he was in charge of the funeral home when the manager was absent.

The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct." 29 C.F.R. § 541.207. The Fifth Circuit found that athletic trainers met this standard because they determined whether an athlete could continue playing following an injury, assessed the extent of an injury, and communicated with parents and coaches, among other things. *See Owsley*, 187 F.3d at 525-27. Similarly, the Tenth Circuit found that game wardens exercised discretion and judgment because they have little supervision, manage their own time each day, and make their own analyses of wildlife populations and their needs. *See Reich*, 993 F.2d at 743.

In the present case, we conclude that Rutlin exercised discretion and independent judgment in performing his duties. Rutlin was responsible for supervising and coordinating the removal of bodies from residences, hospitals and nursing homes; organizing, directing , and supervising funerals; performing embalming procedures, adjusting those procedures to the condition of the deceased; and counseling

families.  As noted by the Seventh Circuit, the duties of a licensed funeral director and embalmer "required consistent exercise of discretion and judgment and specialized knowledge in his field." *Szarnych,* 1998 WL 382891, at *1.

In sum, we conclude that Rutlin was a professional for pay periods I through IV and, therefore, exempt from the overtime provisions of the FLSA.

### B.

Rutlin also complains that he should have been compensated for time spent on call.  The district court rejected this claim, finding that Rutlin's on-call time was not so restrictive as to require pay.

At the outset, we note that Rutlin's claim for on-call compensation is applicable to pay period V only, because we have determined that Rutlin was an exempt professional for pay periods I through IV.  *See* 29 U.S.C. § 213(a)(1); *Aiken v. City of Memphis*, 190 F.3d 753, 760 (6th Cir. 1999) (stating that on-call time can be considered overtime pursuant to 29 U.S.C. § 207(a)), *cert. denied,* 120 S. Ct. 1164 (2000).  Accordingly, the following discussion applies only to pay period V.

An employee must be compensated for on call time spent "predominantly for the employer's benefit." *Aiken*, 190 F.3d at 760.  "[T]he question in on-call cases is whether the employer's restrictions on [its employees'] time prevent the employees from effectively using the time for personal pursuits." *Id.*  To be considered work time, an employee's on-call time must be "severely restricted." *Id.*  This determination is fact-specific, and the circumstances of each case must be considered.  *Id.*  "The fact that some of the plaintiffs' activities have been affected by the policy is not sufficient to make on-call time compensable.  The plaintiffs must show that the policy is so onerous as to prevent them from effectively using their free time for personal pursuits."

and nurses.  *Quirk*, 895 F. Supp. at 785-86.  Likewise, in *Debejian*, the district court held that Non-Destructive Testing ("NDT") Technicians, who were responsible for inspecting and testing steel to determine whether it conformed to industry standards, had not engaged in a "prolonged course of specialized intellectual instruction and study" even though these employees were required to complete 97 hours of training and three months of on-the-job training to become Level I NDT Technicians and were required to complete an additional 100 hours of training and an additional six months of on-the-job training to become Level II NDT Technicians. *Debejian*, 64 F. Supp. 2d at 89-91.

Like the plaintiffs in *Quirk* and *Debejian*, Rutlin possessed a specialized technical skill that was necessary to perform functions of his job as a funeral director and for which he was required to undergo some formal general education and training.  As the courts in both *Quirk* and *Debejian* recognized, however, such a program is not sufficient to qualify for the professional exemption from the overtime provisions of the FLSA.  The mere fact that an employee must obtain some education or training to perform a technical job does not exempt him from the provisions of the FLSA.

Second, the majority reasons that Rutlin meets the third prong of the short test for the professional exemption under the FLSA because he "exercised discretion and independent judgment in performing his duties. . . . [by] supervising and coordinating the removal of bodies from residences, hospitals and nursing homes; organizing, directing, and supervising funerals; performing embalming procedures, adjusting those procedures to the condition of the deceased; and counseling families." *See* maj. op. *ante* at 11.  I disagree.

In my opinion, the majority misunderstands the regulation's requirement that professional "work requires the consistent exercise of discretion and judgment in its performance." *See* 29 C.F.R. §§ 541.3, 541.305(b).  For example, with respect to Rutlin's duties in performing embalming procedures and adjusting those procedures to the various conditions of the

chemicals used in the embalming process was "Embalming," and none of Rutlin's college courses directly related to the process of embalming. J.A. at 77. Rutlin did not even take courses on how to counsel families or how to handle grief associated with death. J.A. at 77. Lastly, unlike many other professionals such as lawyers, Rutlin was not required to complete any continuing education so that he could remain knowledgeable of related disciplines and new developments in his field, nor did he have to attend any informal training sessions on the embalming process to maintain his license. J.A. at 683-84.[2]

In sum, I do not believe that Rutlin completed "a prolonged course of specialized intellectual instruction and study" as contemplated by the regulations. Rather, Rutlin's academic program was akin to those of the plaintiffs in *Quirk v. Baltimore County*, 895 F. Supp. 773 (D. Md. 1995), and *Debejian v. Atlantic Testing Labs., Ltd.*, 64 F. Supp. 2d 85 (N.D.N.Y. 1999), which were held not to be prolonged courses of specialized intellectual instruction.

In *Quirk*, the district court held that Cardiac Rescue Technician-Paramedics ("CRTs"), who were required to complete a training course consisting of 120 hours of classroom instruction and 80 hours of supervised clinical training, and Emergency Medical Technician-Paramedics ("EMTs"), who were required to complete an additional 400 hours of training or the equivalent of 42 college credits, did not have the education necessary to be considered professionals under the FLSA regulations. Specifically, the court held that, despite advanced and rigorous training, the paramedics did not satisfy the regulatory standards for professionals because their educational programs were not comparable to the educational studies that are usually required of traditional professionals, including medical technologists

---

[2]Rutlin's time spent as an apprentice also cannot be characterized as part of "a prolonged course of specialized intellectual instruction and study," as the regulations explicitly exclude apprenticeships from such instruction. 29 C.F.R. § 541.3(a)(1).

*Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 611 (6th Cir. 1992).[1]

Here, Rutlin claims that he was expected to remain at home while on call, where he was required to answer the funeral home's calls, which were forwarded to his house. Rutlin claims that he answered an average of fifteen to twenty calls per night for Prime Succession while on call, spending approximately one hour per night on the phone. Rutlin claims that his on call duties prevented him from drinking alcohol, visiting his children, or boating, and that his meals, evening activities, and sleep were disrupted by his on-call duties.

Prime Succession, on the other hand, contends that Rutlin was free to engage in personal activities while on call. Prime Succession points to Rutlin's testimony that he could switch on call shifts "most of the time" when needed. Prime Succession also claims that it gave Rutlin a pager to allow him to leave his home if desired.

We agree with Rutlin that, for pay period V, he should be compensated for the time spent answering the fifteen to twenty phone calls he received per night. Answering these phone calls was not typical on-call time; rather, Rutlin was actually working, albeit from home. There is no question that the time Rutlin spent on those phone calls was primarily for the benefit of Prime Succession; therefore, Rutlin should be compensated for that time. As for the other time spent on

---

[1]The FLSA regulations state that:

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call." An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.

29 C.F.R. § 785.17.

call, we agree with the district court that the restrictions on Rutlin were not so onerous as to require compensation. Rutlin was free to use that time for personal pursuits. *See Martin*, 968 F.2d at 611. Accordingly, we reverse the judgment of the district court as to this issue and remand the case to the district court to determine appropriate compensation for the time Rutlin spent answering phone calls while on call during pay period V.

## IV.

Finally, Rutlin claims that he and Prime Succession entered into a contract providing that Rutlin would be paid overtime for pay periods I through IV. Even if Rutlin is a professional pursuant to the FLSA, the parties are free to enter into an agreement for overtime compensation. However, the contract to which Rutlin refers, which appears to be an employee booklet, merely states that non-exempt employees will be paid overtime. Because Rutlin is an exempt professional, there is no contractual provision awarding him overtime compensation. We affirm the district court's judgment as to this issue.

## V.

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part, and **REMAND** to the district court for the determination of Rutlin's on-call compensation for pay period V.

To satisfy Michigan's licensing requirements for a mortuary science license, Rutlin had to fulfill the licensure education requirements set forth in § 339.18921 of the Michigan Administrative Code. MICH. ADMIN. CODE r. 339.18921. To begin, Rutlin had to complete two years of college or obtain 60 semester hours or 90 quarter hours of college credit. The licensing rules specify the courses that Rutlin had to complete to satisfy the college education requirement for a mortuary science license; however, these courses simply consist of classes across many fields of study ranging from English composition to accounting to biology.[1] In other words, the college education component of Rutlin's mortuary science licensing program was merely comprised of courses that often make up the core curriculum required of college students generally at numerous colleges and universities across the country. Indeed, with the exception of chemistry and psychology, Rutlin had already taken all of the college courses required under the licensing standards at Valparaiso University, where he had been a college student and had obtained his Bachelor's degree in business administration prior to his enrollment in mortuary science school. (J.A. at 76, 79).

Also, Rutlin had to complete one year of academic study at mortuary science school to receive his license. Contrary to what the majority asserts, however, this year of study, even when coupled with Rutlin's college education, did not involve "a specialized course of instruction directly relating to [Rutlin's] primary duty of embalming humans remains." *See* maj. op. *ante* at 9. In mortuary science school, the only course that Rutlin took to prepare him for handling the

---

[1] The college coursework mandated by Michigan's licensure education requirements for a mortuary science license includes 3 semester or 3 quarter hours of public speaking/communications; 6 semester or 8 quarter hours of accounting, 6 semester or 8 quarter hours of psychology/death and dying/gerontology, 8 semester or 10 quarter hours of chemistry lecture and lab, 6 semester or 8 quarter hours of biological science, 6 semester or 6 [sic] quarter hours of English composition/business writing, and 3 semester or 4 quarter hours of computer science. MICH. ADMIN. CODE r. 339.18921.

attend a minimum of two years of college); Op. Ltr. Dep't of Labor, 1976 WL 41728 (Mar. 5, 1976) (concluding the same for dental hygienists who are required to complete a two-year course of study). Although "not controlling upon the courts by reason of their authority," these interpretations and opinions of the Administrator under the Fair Labor Standards Act "constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Fazekas v. Cleveland Clinic Found. Health Care Ventures, Inc.*, 204 F.3d 673, 677 (6th Cir. 2000) ("[T]he Supreme Court has indicated that an opinion of the Administrator of the Wage and Hour Division of the Department of Labor has persuasive value if the position of the Administrator is well-considered and well-reasoned.").

In this case, Rutlin lacks any specialized instruction equivalent to four years of pre-professional and professional study. Without suggesting any disrespect for Rutlin's job as a funeral director, I conclude that the program Rutlin followed in obtaining his mortuary science license was nothing more than a generalized educational program, and our sister circuits have repeatedly held that generalized educational programs do not fulfill the federal regulatory standards for "'a prolonged course of specialized intellectual instruction and study.'" *Fife v. Harmon*, 171 F.3d 1173, 1176-77 (8th Cir. 1999) (quoting 29 C.F.R. § 541.3(a)(1)) (holding that Airfield Operation Specialists, who were required to possess "a Bachelor's degree in aviation management or a directly related field, or four years of full-time experience in aviation administration, or an equivalent combination of experience and education," were not exempt professionals under the FLSA because they obtained their advanced knowledge "'from a general academic education and from an apprenticeship,' not from 'a prolonged course of specialized intellectual instruction'"); *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1565-66 (11th Cir. 1991) (holding the same for an adult probation officer who was required to hold a Bachelor's degree in any major, not in a specialized field such as criminal justice).

―――――――――

**DISSENT**

―――――――――

KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent from the majority's holding that Rutlin was a professional exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA") for pay periods I through IV. In affirming the partial grant of summary judgment on Rutlin's claims for overtime compensation, the majority fails to recognize the inherent distinctions between "a prolonged course of specialized intellectual instruction and study" and an academic program for specialized training. The majority also disregards the differences between the discretion and judgment that professional employees must utilize in applying their intellectual knowledge in the workplace and the discretion and judgment that highly skilled technical workers must employ in using their technical training to perform their job tasks. Because I believe that Michigan's licensing requirements for funeral directors do not constitute "a prolonged course of specialized intellectual instruction and study" and that Rutlin did not exercise the type of discretion and judgment normally employed by professionals in their jobs, I would hold that Rutlin does not satisfy the criteria for the professional exemption under the short test of the FLSA and, therefore, should be compensated for his overtime services.

Additionally, because I believe that there are genuine issues of material fact as to whether all of Rutlin's on-call time was compensable, I respectfully dissent from the majority's conclusion that Rutlin is entitled to compensation solely for the time he actually spent answering the fifteen to twenty phone calls per night during his on-call duty.

## I.

Under the short test for the professional exemption, an employee is exempt from the overtime pay provisions of the Act if his employer proves: (1) that he is paid at a "rate of at least $250 per week exclusive of board, lodging, or other facilities"; (2) that the employee's work requires "knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study"; and (3) the employee's "work requires the consistent exercise of discretion and judgment in its performance." 29 C.F.R. §§ 541.3(a), 541.315. Here, the parties do not dispute that the short test applies to this case, nor do they dispute that Rutlin satisfies the first prong of the test. They dispute only whether Rutlin satisfies the second and third prongs of the short test.

The majority holds that Rutlin's role as a funeral director satisfies both the second and third prongs of the short test for the professional exemption from the overtime pay requirements of the FLSA. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.3. First, the majority reasons that Rutlin satisfied the second prong because he completed "a specialized course of instruction directly relating to his primary duty of embalming humans remains," *see* maj. op. *ante* at 9, a course of study which included two years of college, one year of mortuary science school, practice as an apprentice for one year, and national and state boards.

I disagree with this reasoning. I believe that the "course" of study Rutlin undertook to obtain a mortuary science license under Michigan law does not conform to the federal regulations that define the requirements for professional employment status in 29 C.F.R. § 541.3. These regulations, while noting that "[t]he areas in which professional exemptions may be available are expanding," make clear that the exemption was not intended to apply to technical specialists, such as legal stenographers — or in this case, funeral directors — who have merely completed a program for learning a particular skill and who have acquired only in-

depth, technical knowledge of a specific area primarily as a result of their work experience. 29 C.F.R. § 541.301(e)(2) ("However, just as an excellent legal stenographer is not a lawyer, these technical specialists must be more than highly skilled technicians. Many employees in industry rise to executive or administrative positions by their natural ability and good commonsense, combined with long experience with a company, without the aid of a college education or degree in any area. . . . The professional person, on the other hand, attains his status after a prolonged course of specialized intellectual instruction and study.").

In fact, the regulations explicitly state that the "typical symbol of the professional training and the best *prima facie* evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite." 29 C.F.R. § 541.301(e)(1). Furthermore, in listing professions that satisfy the criteria for professional status under the FLSA, the regulations almost exclusively identify occupations that require a Bachelor's degree and, in some instances, a graduate degree. 29 C.F.R. § 541.301(e)(1) ("Generally speaking the professions which meet the requirement for a prolonged course of specialized intellectual instruction and study include law, medicine, nursing, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical, and biological sciences, including pharmacy and registered or certified medical technology and so forth."). In addition to these regulations, the Department of Labor has issued numerous opinion letters stating that a prolonged course of intellectual instruction generally means "the equivalent of four academic years of pre-professional and professional study in an accredited university or college." *See* Op. Ltr. Dep't of Labor, 1998 WL 852713 (Feb. 19, 1998) (stating that medical assistants, who are required to have one year of specialized training at a junior college and who must be certified by the State of Florida, are not exempt professionals); Op. Ltr. Dep't of Labor, 1997 WL 998018 (June 30, 1997) (asserting the same for licensed veterinary technicians who are required to