**Michael L. SCHAEFER, Plaintiff,**

v.

**INDIANA MICHIGAN POWER COMPANY, d/b/a American Electric Power, Defendant.**

**Case No. 1:00–CV–559.**

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 26, 2002.

Stephen D. Turner, Grand Rapids, MI, for Plaintiff.

Joseph J. Vogan, Elizabeth Wells Skaggs, Grand Rapids, MI, for Defendant.

## OPINION

QUIST, District Judge.

Plaintiff, Michael L. Schaefer ("Schaefer"), has sued his employer, Indiana Michigan Power Company, d/b/a American Electric Power ("AEP"), alleging that AEP has violated the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201 to 219, by failing to pay Schaefer for overtime work at 1–1/2 times his normal hourly rate as required by 29 U.S.C. § 207(a)(1). AEP contends that Schaefer is an exempt employee under the FLSA's exemptions for "administrative" and "professional" employees. In addition, AEP contends that it acted in good faith in determining that Schaefer was an exempt employee. Now before the Court are the parties' cross motions for summary judgment.

## I. Facts

Schaefer is employed by AEP as an environmental specialist[1] in the Environmental Department at AEP's Cook Nuclear Plant (the "Plant") in Bridgman, Michigan. Schaefer began his employment with AEP in 1987 as a radiation protection ("RP") technician, junior. During his tenure with AEP, Schaefer was promoted to radiation protection technician, engineering technologist, and radioactive material specialist. Schaefer's current position is classified by AEP as an exempt position.[2] Schaefer is paid a salary of $67,000 per year. Schaefer's direct supervisor is Jeff Long ("Long"), who is also classified as an exempt employee.

Schaefer's primary job responsibility is to oversee the shipment of low-level radioactive materials and waste from the Plant to third-party processors. Some examples of the types of materials shipped include chemistry samples, radioactive oil samples, and laundry such as protective clothing. (Long Dep. at 34–35, Pl.'s Br. Supp. Ex. 3; Schaefer Dep. at 217, Def.'s Br. Supp. Ex. B.) Because he is responsible for overseeing shipment of radioactive waste and materials, Schaefer is required to be certified as a qualified shipper pursuant to 49 C.F.R. § 172(h).

The job description for Schaefer's position identifies the overall job functions as follows:

[S]upervise the transfer, packaging and transport of radioactive waste and ra-

---

1. Schaefer's former title was radioactive material specialist senior, which was essentially the same job as his current environmental specialist position.

2. Schaefer has been classified as an exempt employee since approximately 1988. (Schaefer Dep. at 51, Pl.'s Br. Supp. Ex. 2.)

dioactive material, consistent with Technical Specifications, Department of Transportation (DOT) regulations, Nuclear Regulatory Commission (NRC) regulations and State and Burial Site regulations. Provide for training and retraining in DOT, NRC and Burial Site requirements and plant instructions, operating procedures for the transfer, packaging and transport of radioactive waste and radioactive material.

(Position Description, Def.'s Br. Supp. Ex. G.)

With regard to actual shipments of materials, Schaefer is often involved in the process from beginning to end, including: selecting the transporter and waste processing facility to receive the material; scheduling the shipment; determining the type and method of packaging to be used; preparing the shipping documents, such as manifests; reviewing packaging surveys prepared by RP technicians; inspecting the truck to ensure that it complies with applicable regulations; verifying that the transporter has a license to receive the type and quantity of radioactive materials being shipped; inspecting the shipping container or package; ensuring that the load is properly braced and blocked; and ensuring that the truck contains the proper radioactive signage. (Schaefer Dep. at 61–62, 148, 186, 194–95.)

In addition to coordination and oversight of shipments, Schaefer is responsible for preparing and reviewing various reports, such as "condition evaluation reports," laboratory reports, and scaling factor reports. (*Id.* at 154–55, 217.) One of Schaefer's duties is writing, updating, and revising procedures relating to the handling and processing of radioactive materials. (*Id.* at 189.) Although Schaefer has only written (co-authored) one new procedure, he has corrected or revised approximately seventy existing procedures. (*Id.* at 319.) Schaefer has also prepared "position papers," which are short statements of consensus of the environmental department "defend[ing] some of the procedures ... in place." (*Id.* at 289.) Schaefer also performs "benchmarking" as part of his duties, a process by which he obtains information or recommendations from other nuclear facilities regarding radioactive waste disposal practices or procedures. Schaefer reviews that information, determines the alternatives that are suitable and most appropriate for implementation at the Cook facility, and makes a recommendation from among the competing alternatives. (*Id.* at 158.)

Schaefer's educational background includes an Associates of Applied Science Degree in nuclear power technology. (*Id.* at 74.) Schaefer has also received training while at AEP on various topics such as "Radiation Effects on the Cell," "Acute Exposure Effects," "Shielding of Alpha," and "Ionization Chamber Detectors." (Schaefer Training History, Def.'s Br. Supp. Ex. C.) Some of the training is administered through brief lectures in a classroom-type setting, while other training is administered through handouts. Schaefer also participates in some off-site training. For example, he completed a week-long course in "radwaste packaging, transportation and disposal" at Hilton Head, South Carolina as part of a recertification that is required for his job. (Schaefer Dep. at 134–35.)

During his employment, Schaefer has worked more than forty hours but has not been paid one and one-half times his normal rate of compensation. Schaefer contends that he is entitled to overtime compensation for this work. AEP denies that Schaefer is entitled to overtime compensation because his position comes within one of the exemptions under the FLSA.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any materi-

al fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### III. *Discussion*

Schaefer contends that he is entitled to summary judgment on the issue of liability because AEP cannot establish any of the exemptions. Schaefer also contends that he is entitled to summary judgment on the issue of liquidated damages. AEP contends that it is entitled to summary judgment because there is no genuine issue of material fact that Schaefer's position is covered by the administrative and/or pro-

fessional exemption. AEP also contends that it acted in good faith in classifying Schaefer's position as exempt and is entitled to summary judgment on the issues of bad faith and willfulness. As set forth below, the Court concludes that Schaefer's position falls within the administrative exemption and that AEP is entitled to summary judgment on Schaefer's claim.

Pursuant to section 7(a)(1) of the FLSA, an employer must compensate an employee who works more than forty hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA provides an exemption from this requirement for "any employee employed in a bona fide executive, administrative, or professional capacity" as those terms are defined in the Secretary of Labor's regulations. 29 U.S.C. § 213(a)(1). An employer relying on an exemption has the burden of proving that the employee is properly classified under the exemption. *Mich. Ass'n of Governmental Employees v. Mich. Dep't of Corr.,* 992 F.2d 82, 83 (6th Cir.1993). The employer bears not only the burden of proof, but it must also show that the employee meets every aspect of the definition for an exempt employee. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).[3] The exemptions from the FLSA's coverage

---

**3.** The parties dispute whether AEP bears a heightened burden of proof in this case. Schaefer contends that AEP must present "clear and convincing" evidence that Schaefer's position comes within one of the exemptions, while AEP contends that it need only meet the preponderance of the evidence standard. In a recent case, the Sixth Circuit observed in a footnote that an employer seeking to rely on an exemption "must establish through 'clear and affirmative evidence' that the employee meets every requirement of the exemption." *Ale v. Tenn. Valley Auth.,* 269 F.3d 680, 691 n. 4 (6th Cir.2001) (citing *Roney v. United States,* 790 F.Supp. 23, 26 (D.D.C.1992)). Other circuits have adopted

this standard, without much elaboration on the rationale for doing so. *See Donovan v. United Video, Inc.,* 725 F.2d 577, 581 (10th Cir.1984). One court has observed, after reviewing cases adopting the "clear and affirmative evidence" standard, "that it is merely a different articulation of the same preponderance of the evidence standard, as applied to a remedial statute which is to be narrowly construed." *Reich v. Chicago Title Ins. Co.,* 853 F.Supp. 1325, 1329 n. 2 (D.Kan.1994) (citing *Walling v. Gen. Indus. Co.,* 330 U.S. 545, 548–49, 67 S.Ct. 883, 884–85, 91 L.Ed. 1088 (1947)). Another judge in this district, after examining the basis for imposing a

must be narrowly construed against the employers seeking to assert them. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). The question of how an employee spends his time is a question of fact, while the question of whether his activities fall within an exemption is a question of law. *Reich v. Wyoming*, 993 F.2d 739, 741 (10th Cir.1993).

The regulations issued by the DOL prescribe various tests for determining whether an employee is covered by an exemption. An employer seeking to establish an exemption must show that the circumstances of the employee's position satisfy either the "long test," which consists of five parts, *see* 29 C.F.R. §§ 541.2(a)-(e), 541.3(a)-(e), or, if the employee earns more than $250 per week, a three-part "short test," *see* 29 C.F.R. §§ 541.2(e)(2), 541.3(e). Because it is undisputed that Schaefer earns more than $250 per week, the short test applies in this case. Under the short test for the administrative exemption, the employer must prove that: (1) the plaintiff is paid on a salary basis; (2) the plaintiff's

primary job duties consist of "office or non-manual work directly related to management policies or general business operations of [the] employer or [the] employer's customers"; and (3) the plaintiff's job duties require him to "customarily and regularly" exercise discretion and independent judgment. 29 C.F.R. §§ 541.2(a)(1), (e)(2); *Douglas v. Argo–Tech Corp.*, 113 F.3d 67, 70–71 (6th Cir.1997). The short test for the professional exemption requires the employer to show that: (1) the plaintiff is paid on a salary or fee basis; (2) the plaintiff's work required "knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes"; and (3) the plaintiff's job duties require him to "customarily and regularly" exercise discretion and independent judgment. 29 C.F.R. § 541.3(e); *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 741 (6th Cir.2000).[4]

---

"clear and affirmative evidence" burden of proof on the employer, concluded that it was "of questionable origin" and declined to apply a heightened burden of proof. *See Martin v. Ind. Mich. Power Co.*, No. 1:00–CV–218, slip op. at 5–6 (W.D.Mich. Jan. 9, 2002). After reviewing several of the early decisions employing this standard, this Court agrees with the analysis in *Chicago Title Insurance Co.* that the standard is simply a different articulation of the preponderance of the evidence standard. Therefore, the Court will not hold AEP to a higher burden of proof.

4. As will be discussed more specifically, *infra*, with regard to the administrative exemption, this Court has serious reservations about adhering to the Sixth Circuit's usage of "customarily and regularly" to describe the amount or frequency of discretion and independent judgment required under the administrative and professional short tests. The "customarily and regularly" requirement is part of the long test for the administrative

exemption, *see* 29 C.F.R. § 541.2(b) (requiring that the employee "customarily and regularly exercise[ ] discretion and independent judgment"), but is not a requirement under the short test, *see* 29 C.F.R. §§ 541.2(e)(2), 541.214 ("work requiring the exercise of discretion and independent judgment"). The "customarily and regularly" requirement is not included in either the long or the short test for the professional exemption. Rather, that exemption requires "the consistent exercise of discretion and judgment." 29 C.F.R. § 541.3(b), (e). In *Rutlin*, which applied the professional exemption, the court cited *Owsley v. San Antonio Independent School District*, 187 F.3d 521 (5th Cir.1999), and *Douglas v. Argo–Tech. Corp.*, 113 F.3d 67 (6th Cir. 1997), as supporting the "customary and regularly" requirement. The *Owsley* court, however, stated that the inquiry under the short test for the professional exemption was "whether the work required consistent exercise of discretion and judgment," *Owsley*, 187 F.3d at 524, 525, not whether the employee

## A. Administrative Exemption

### 1. Salary Basis

 Schaefer contends that the first prong—the salary basis requirement—is not met, even though he received a salary of at least $60,000 in 2000, because he is required to account for at least 40 hours of work on his timesheet each week and must make up for a partial-day absence by either working extra hours on another day or taking part of a vacation day.

The DOL's regulations provide that an employee is considered as being paid on a salary basis "if under his employment agreement he regularly receives each pay period on a weekly or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a). An employee paid on a salary basis is entitled to "his full salary for any week in which he performs any work without regard to the number of days or hours worked." *Id.* An employer may make a deduction from a salaried employee's compensation for absences of a day or more. *See* 29 C.F.R. § 541.118(a)(2), (3); *Mich. Ass'n of Governmental Employees,* 992 F.2d at 84.

Most courts have held that an employee's exempt status is not affected when the employer makes non-monetary deductions for work absences from fringe benefits such as personal or sick time. *Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1070 (7th Cir.1997)("Nothing in the regula-

tions suggests that an employee loses his exempt status simply because his employer disciplines him in a non-monetary fashion for failing to work during his scheduled time."); *Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 289 (D.P.R.1999) ("A majority of the courts ... have held that a deduction from an employee's accrued leave time for partial-day absences does not affect the employee's status as being paid on a salary basis."); *Baudin v. Courtesy Litho Arts, Inc.,* 24 F.Supp.2d 887, 891 (N.D.Ill.1998) (stating that "Courtesy's deductions from Baudin's vacation time for full-day absences [ ] do not render him non-exempt"); *Cooke v. Gen. Dynamics Corp.,* 993 F.Supp. 50, 53–55 (D.Conn.1997) (concluding that the facts that the plaintiffs were required to work and account for eight hours per day, forty days per week and to make up for less-than eight hour days by making up the time on another day or using paid benefit time did not render the employees non-exempt); *Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 259 (S.D.N.Y.1997) (noting that "[w]ith few exceptions, courts have answered this question in the negative, finding that employers do not violate the salary-basis test where deductions come from something other than an employee's base pay"); *Graziano v. Soc'y of the N.Y. Hosp.,* No. 96 Civ. 2716(HB), 1997 WL 639026 (S.D.N.Y. Oct.15, 1997) (granting summary judgment for the employer on reconsideration based upon DOL opinion letter stating that "the policy of deducting vacation, holiday and

customarily and regularly exercised discretion. In *Douglas,* the court stated that the employer was required to show that the plaintiff customarily and regularly exercised discretion and independent judgment in order to meet the short test for the administrative exemption but failed to cite any authority for including the "customarily and regularly" requirement under the short test. *Douglas,* 113 F.3d at 70–71. There is no discernable rationale in any Sixth Circuit opinion for imposing

the "customarily and regularly" standard in the short test for the administrative exemption or in the long and short tests for the professional exemption. The effect of such a requirement is a more onerous burden on employers seeking to establish the administrative exemption under the short test (no prescribed amount versus "customarily and regularly") but a reduced burden on employers under the professional exemption ("customarily and regularly" versus "consistent").

sick pay for partial day absences does not render employees non-exempt under the FLSA, even when such accrued time is subject to a cash pay out"). Rather, an employee's exempt status is lost only when the employer docks the employee's pay. *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 615 (2d Cir.1991).

The cases cited by Schaefer fail to persuade the Court that Schaefer's argument is correct. For example, Schaefer relies on dictum contained in a footnote in *Abshire v. County of Kern*, 908 F.2d 483 (9th Cir.1990), that "a strong argument can be made that even if deductions were required only from fringe benefits such as leave time, and not from base pay, the affected employees would still not qualify as 'salaried.'" *Id.* at 487 n. 3. When later confronted with the issue, the Ninth Circuit rejected the argument in the *Abshire* footnote. *See Barner v. City of Novato*, 17 F.3d 1256, 1261–62 (9th Cir.1994). *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2d Cir.1991), is distinguishable from this case because there, the employer had a policy of docking employees' pay for absences less than a day and actually enforced the policy against some of its employees by reducing their pay. *Id.* at 617. In this case, Schaefer has not presented any evidence that AEP has a policy of docking its employees' pay for partial-day absences and Schaefer admitted in his deposition that he has never had his pay docked. (Schaefer Dep. at 112.) Although *Thomas v. County of Fairfax*, 758 F.Supp. 353 (E.D.Va.1991), supports Schaefer's position, it is in conflict with another case from that district, *International Association of Fire Fighters v. City of Alexandria*, 720 F.Supp. 1230 (E.D.Va.1989). Moreover, in an unpublished decision in *Vogel v. American Home Products Corp. Severance Pay*

*Plan*, No. 96–2674, 1997 WL 577578 (4th Cir. Sept.17, 1997) (per curiam), the Fourth Circuit endorsed the reasoning of *Fire Fighters*. *Vogel*, 1997 WL 577578, at *5. Accordingly, the Court concludes that AEP has satisfied its burden of showing that Schaefer was paid on a salary basis.

2. **Office or Non-manual Work Directly Related to Management Policies or General Business Operations of the Employer**

To meet its burden on the second prong of the administrative exemption, AEP must show that Schaefer's primary job duties are office or non-manual work and that such duties relate either to AEP's management policies or its general business operations. 29 C.F.R. § 541.2(a)(1), (e)(2). Under the regulations, an employee's primary duty is the duty of most importance to the employer. 29 C.F.R. §§ 541.103, 541.206(b). Although it is "a good rule of thumb" that an employee's primary duty will consume over fifty percent of his time, time alone is not determinative where the employee spends more than fifty percent of his time performing collateral tasks. 29 C.F.R. § 541.103.[5]

The evidence demonstrates that Schaefer's primary job duty is the planning and oversight of shipments of radioactive materials, which primarily involves non-manual or office work. Schaefer admitted in his deposition that in the past few years he spent around fifty percent of his time at his desk and currently spends greater than eighty percent of his time at his desk. (Schaefer Dep. at 63–64.) Schaefer conceded that his primary duties are not "manual-type" duties that would require him to get "dirty or greasy," and Schaefer does not consider himself to be a manual

---

5. One example given by the regulation is an employee with "broad responsibilities similar to those of the owner or manager of the establishment, [who] generally spends more than 50 percent of his time in production or sales work." 29 C.F.R. § 541.103.

laborer. (*Id.* at 17, 64.) Schaefer contends that his primary duties are manual because he performs many tasks associated with the physical shipment of radioactive materials, such as inspecting the shipping container, inspecting the truck, checking the tightness of or installing restraining straps, and bracing and blocking the load. Even if these activities constitute manual labor, Schaefer's own testimony confirms that his primary duty involves office or desk work that would be considered administrative in nature. *See* 29 C.F.R. § 541.203. For example, during his deposition, Schaefer was asked a series of questions comparing his duties to those of Mr. Mims, a non-exempt RP tech:

> Q: You indicated that Mr. Mims does some of your shipping duties or some of the same duties you do.
>
> A: That's correct.
>
> Q: He also does a number of things out in the field that you don't do, correct?
>
> A: That's correct.
>
> Q: Is he out in the field and more hands on than you are?
>
> A: That's a fair assessment.
>
> Q: He does surveys of trucks?
>
> A: Yes.
>
> Q: He sorts through the waste, the trash?
>
> A: Yes.
>
> Q: He drives forklift?
>
> A: Yes.
>
> Q: He loads trucks?
>
> A: Yes.
>
> Q: Stacks laundry?
>
> A: Yes.
>
> Q: You don't generally do those things, do you?
>
> A: That's correct.
>
> Q: You investigate condition reports?
>
> A: Yes.
>
> Q: You write position papers?
>
> A: I've written six, yes.
>
> Q: You write procedures?
>
> A: I recommend changes be made to procedures, primarily do corrections and clarifications to procedures.
>
> Q: You review the work of techs on occasion, don't you?
>
> A: That's correct.
>
> Q: You review the technicians shipment surveys on occasion for adequacy, don't you?
>
> A: Yes, I do.
>
> Q: Mr. Mims doesn't do those things, does he?
>
> A: I couldn't say with a hundred percent certainty that he does not do all that long list that we just went through.
>
> Q: Those aren't generally his primary job duties?
>
> A: They are not generally his primary job duties, that's correct.

(*Id.* at 131–33.) Long, Schaefer's supervisor, confirmed that Schaefer spent a substantial majority of his time at his desk completing paperwork. Long's estimate of eighty to ninety percent was similar to Schaefer's estimate. (Long Dep. at 125–26.)

Although Schaefer argues that he performs so much manual work that he cannot be considered a white-collar employee, the evidence shows otherwise.[6] There is no

---

**6.** Schaefer contends, based upon his deposition testimony, that in the most recent year he spent approximately twenty percent of his time on manual work and in prior years he spent approximately fifty percent of his time on manual work. There is no evidence in the record to support this conclusion. The fact that Schaefer may have spent fifty percent of his time at his desk does not mean that the other fifty percent was spent on manual work because work performed away from a desk might be either manual or non-manual work. For example, in his declaration, Schaefer asserts that he spends approximately two hours

dispute that Schaefer actually spends some portion of his time inspecting the trucks, which may include performing some manual tasks, but his primary work duties are not manual-type duties.[7] (Schaefer Dep. at 61–64.) Apart from preparing shipping paperwork, Schaefer's time is spent on other non-manual or office work, such as preparing condition reports, annual scaling factor reports, and position papers; writing and maintaining procedures; preparing a program self-assessment; tracking weekly waste generation; developing and maintaining records, graphs, and reports for monitoring radioactive waste generation; providing guidance to RP technicians on how to perform their work; and studying and making recommendations on methods of handling spent filters. (*Id.* at 155–58, 217; Long Dep. at 54–55, 58–59.) Moreover, many of the activities listed on Schaefer's resume, which include "[o]rganiz[ing] interdepartmental support for radioactive material shipments," "[p]lan[ning] and implement[ing] waste reduction program," and "[m]anifest[ing] radioactive material and waste shipments" are the types of activities generally performed in an office environment. (Schaefer Resume, Def.'s Br. Supp. Ex. D.)

Although Schaefer's primary duty consists of office or non-manual work, it must be either directly related to AEP's management policies or general business operations in order to fulfill the second prong of the short test. This requirement is met by "activities relating to the administrative operations of a business as distinguished from 'production.'" 29 C.F.R. § 541.205(a). In addition, the activities must be "of substantial importance to the management or operation of the business of [the] employer." *Id.* Administrative operations of a business include work performed by "white collar employees engaged in 'servicing' a business," such as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). Work of substantial importance to the management or operation of the business is not limited to work performed by persons whose responsibilities

---

"physically inspecting" various aspects of the shipment. (Schaefer Decl. ¶ 5, Pl.'s Reply Br. Ex. 7.) Inspection work is not necessarily manual work. Examining a truck for proper labeling and load bracing is not manual work. Picking up a hammer and actually performing the blocking and bracing is manual work. However, Schaefer testified that he does manual work "[a] portion of each day that [he's] actually making a shipment," but noted that "the nature of that work then is sometimes as little as to check the tightness on a restraining strap ... [or] to install that strap" or to use a hammer and nails to brace and block a package. (Schaefer Dep. at 62.)

7. Schaefer has submitted a declaration in which he states that he spends about two out of six hours per shipment physically inspecting the transport vehicle, containers, labeling, and the load bracing, and that with small shipments of low dosage material he will often carry the material to the packaging area and package it himself. (Schaefer Decl. ¶¶ 5,

6.) AEP contends that the Court should disregard Schaefer's declaration because it contradicts his prior deposition testimony. The Sixth Circuit has held that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). While the Court does not find the entire affidavit excludable under the rule stated in *Reid*, the Court does note that Schaefer's statements regarding the amount of manual labor he performs do seem to contradict his admissions in his deposition establishing that the majority of his time is spent on non-manual office tasks. However, even if the Court considers those portions of the declaration, they do not suffice to create a genuine issue of material fact regarding the amount of non-manual work Schaefer performs as the evidence given by Schaefer establishes that his duties largely involve non-manual work.

include formulating management policy, but "also includes a wide variety of persons who either carry out major assignments in conducting the operation of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c). Although the regulations indicate that it is not possible to formulate generalized rules about when work is or is not of substantial importance to the management or operation of a business, they do set forth examples of exempt and non-exempt positions. Those performing routine clerical tasks obviously do not perform work of substantial importance to the management or operation of the business. *See* 29 C.F.R. § 541.205(c)(2). On the other hand, advisory specialists and consultants, credit managers, safety directors, claim agents and adjusters, and wage-rate analysts may meet the test. *See* 29 C.F.R. § 541.205(c)(5).

Many courts employ an administrative/production dichotomy to determine whether an employee is performing administrative work of substantial importance to the management or operation of the business. The court in *Dalheim v. KDFW–TV*, 918 F.2d 1220 (5th Cir.1990), described this analysis:

Section 541.205(a) is not concerned with distinguishing between white collar and blue collar employees, or between service industries and manufacturing industries. The distinction § 541.205(a) draws is between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.

*Id.* at 1230. The plaintiffs in *Dalheim* were a group of present and former general-assignment reporters, producers, directors, and assignment editors of a local television station. The district court concluded that the news producers were not exempt administrative employees, and the Fifth Circuit affirmed, concluding that the news producers were directly involved in the production of the employer's product. The Fifth Circuit rejected the employer's argument that white collar employees such as producers could not be involved in production, noting that: (1) the producers' responsibilities began and ended with the ten-to-twelve minute segments on which they worked; and (2) they were not responsible for setting business policy, determining the long or short term objectives of the news department, promoting the newscast, negotiating salary or benefits with other department personnel, or any other type of administrative work described in 29 C.F.R. § 541.205(b). *Id.* at 1231. In *Reich v. John Alden Life Insurance Co.*, 126 F.3d 1 (1st Cir.1997), the court observed that "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Id.* at 9. The parties had stipulated that the product produced by the employer, a life insurance company, was life insurance policies. The court of appeals held that the plaintiff-marketing representatives of the company were engaged in administrative rather than production activities because they were not directly involved in producing the product, i.e., the policies. The court noted that the marketing representatives were responsible for activities such as keeping agents informed of changes in the product and pricing structure, advising agents on which policies should be marketed against competitors' products, and helping agents put together proposals for bidding on new business. These activities were ancillary

to production of life insurance policies. *Id.* at 10; *see also Cooke v. Gen. Dynamics Corp.*, 993 F.Supp. 56, 61 (D.Conn.1997) (stating that "the administrative/production dichotomy focuses not on whether an employee worked for an enterprise engaged in production activity, but whether the employee's primary duty was producing the product in question"); *Reich v. Chi. Title Ins. Co.*, 853 F.Supp. 1325, 1330 (D.Kan.1994) (holding that escrow closers employed by title insurance company performed production activities because escrow closings were "a very real product" of the title insurer).

The product AEP produces is electricity. Schaefer argues that his job is intertwined with the production of electricity because radioactive materials and waste are by-products of the process of producing electricity. That may be true, but using that reasoning, almost all jobs at the Cook plant, with the possible exception of human resource positions, would fall on the production side of the business because each job probably has some arguable connection to the production of electricity. For example, a buyer of materials used in the production of electricity would be engaged in production rather than servicing or supporting the business. While the buyer's performance of his duties supports the production of electricity, however, it does not involve the actual production of the product. Likewise, Schaefer's job of managing the radioactive waste stream is ancillary to the production of electricity and, thus, his primary duty is not producing the commodity.

Schaefer argues that he cannot be considered an administrative employee, even if his primary duties are not production work, because he does not perform administrative work such as advising management and planning. Rather, Schaefer contends that his work in shipping radioactive material is routine and merely calls for the application of mandatory procedures, regulations, or standards. Contrary to Schaefer's assertion, there is ample evidence that his duties include administrative work. While it is true that some of Schaefer's activities are routine and/or repetitive, such as, for example, supervising the shipping of laundry, much of what he does is not routine and requires him to use his experience. He is responsible for planning and scheduling shipments and is required to resolve conflicts or problems that may arise with multiple shipments on the same day. (Schaefer Dep. at 291.) Some shipments are not routine. One recent project involved the disposal of large blocks of concrete from the steam generator. Schaefer investigated the options for dealing with the concrete and made a recommendation based upon cost that it be left at the plant rather than shipped elsewhere. (*Id.* at 206–08.) Schaefer supervised a shipment of two retired steam generators by rail to a disposal site. This shipment was unique not only for the Cook plant, but also for Schaefer, as he was one of the few radioactive shippers in the country to have completed such a shipment. (*Id.* at 310, 328–29.) Schaefer investigates and makes recommendations on options for disposing of waste and waste disposal practices through discussions with other facilities and radioactive waste processors. (*Id.* at 201–02, 204.) Schaefer also makes recommendations on how to dispose of particular waste items and provides cross-departmental disposal or shipping support. For example, if another department needs to dispose of something such as a motor, Schaefer will advise them on how to ship it and will prepare the necessary documentation. (*Id.* at 204, 218.)

Apart from the actual shipment of waste, Schaefer is also primarily responsible for writing, updating, and revising procedures. (*Id.* at 189.) Schaefer has only written one procedure from scratch and estimates that he has made about seventy

revisions, although only "a handful" involved substantial procedure rewrites. (*Id.* at 311–12, 319.) Long estimated that Schaefer spends forty percent of his time on writing and maintaining procedures. (Long Dep. at 58.) Although Schaefer did not give a specific estimate of the time he spends on correcting and maintaining procedures, he acknowledged that it is a "labor-intensive" activity that can "take[ ] a lot of [his] time." (Schaefer Dep. at 198.) Schaefer may change or rewrite a procedure as part of a collaborative effort among Schaefer and others within the environmental department. (*Id.* at 290.) Other revisions and modifications occur as a result of information Schaefer receives from RM technicians. (*Id.* at 197.) Although Schaefer may not always be the person who identifies the need for a change or modification to a procedure, he is still the person primarily responsible for making the change or modification. Schaefer is also responsible for preparing various reports and completing special projects. Schaefer estimates that he spends between ten to twenty percent of his time completing condition reports. (*Id.* at 217.) A condition report identifies a problem and makes recommendations for corrective action based upon an investigation of the circumstances. (Long Dep. at 26.) Schaefer also prepares annual scaling factor reports and position papers. Other projects Schaefer has completed include a study and evaluation of proper methods for handling spent filters; preparation of a programmatic assessment of radioactive waste material practices; review of liquid radioactive waste processing for problems areas and improvements; evaluation of SEG processing methods for volume reduction and cost in comparison to conventional off-site processing methods; and, in response to a performance audit, performed benchmarking, made procedure changes, and wrote position papers.

(Schaefer Dep. at 159, 294, 296, 324–25, 327.)

Schaefer also deals with, and on occasion makes recommendations regarding, waste processors. For example, he makes recommendations based on price. (*Id.* at 214.) He has also made a recommendation of which among multiple vendors should be selected based upon his review of their qualifications. (*Id.* at 271.) Schaefer also challenged a vendor's method of invoicing, which resulted in a savings of $85,000 to AEP. (*Id.* at 298–99; 6/01/96 Job Performance Review at 3, Def.'s Br. Supp. Ex. I.) While Schaefer may not perform these and the other duties cited above on a constant basis, the record adequately demonstrates that he regularly performs administrative functions relative to management of AEP's radioactive waste stream.

■ Even if an employee is involved in performing administrative activities, the regulations still require that the work be of substantial importance to the management or operation of the business. 29 C.F.R. § 541.205(a). Although those who participate in the formulation of management policies or the business operations as a whole will meet this requirement, the exemption is not limited to such employees. *John Alden Life Ins. Co.*, 126 F.3d at 10 (citing § 541.205(c)). The regulations indicate that this requirement is not satisfied by showing a link between an employee's poor performance and financial loss:

> An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks. A messenger boy who is entrusted with carrying large sums of money or securities cannot be said to be doing work of importance to the busi-

ness even though serious consequences may flow from his neglect. An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. An inspector, such as, for example, an inspector for an insurance company, may cause loss to his employer by the failure to perform his job properly. But such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be "directly related to management policies or general business operations" as that phrase is used in § 541.2.

29 C.F.R. § 541.205(c)(2). Rather, "in assessing substantial importance it is necessary to look at 'the *nature* of the work, not its ultimate consequence.'" *John Alden Life Ins. Co.*, 126 F.3d at 11 (quoting *Clark v. J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir.1986)).

The Court concludes that Schaefer's work is of substantial importance to AEP's operations. While the consequences of Schaefer's failure to perform his work could be substantial and disastrous to both AEP and the public, the importance of Schaefer's work arises from the nature of AEP's business. AEP produces electricity via nuclear reaction, which in turn produces a substantial amount of radioactive waste and material which must be properly transported and disposed of in order to prevent harm. Proper management of the waste stream is vital. Furthermore, Schaefer works independently, with little or no direct supervision, and provides guidance to others, including technicians, those in other departments, and his supervisors, on proper shipping procedures and requirements. (Schaefer Dep. at 148, 204, 218.)

### 3. Discretion and Independent Judgment

The final element of the short test that AEP must prove for the administrative exemption is that Schaefer exercised discretion and independent judgment. 29 C.F.R. §§ 541.2(e)(2); 541.214. The parties disagree about the level of discretion and independent judgment that is required. Schaefer contends that under Sixth Circuit precedent, the test is "customarily and regularly." *See Douglas*, 113 F.3d at 70–71. AEP contends that the occasional exercise of discretion will suffice under the short test because the regulations governing the short test do not prescribe any particular amount of discretion and independent judgment. This Court agrees with AEP, because the "customarily and regularly" language appears exclusively in the long test for the administrative exemption and the short test only requires the exercise of some discretion. *See* n. 4, *supra*. In fact, to this Court's knowledge, every circuit except the Sixth Circuit has recognized that the short test only requires the exercise of *some* discretion and independent judgment. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 901 & 901 n. 4 (3d Cir.1991) (quoting 29 C.F.R. § 214(a)); *Donovan v. Tama Meat Packing Corp.*, 817 F.2d 54, 55 (8th Cir.1987) (per curiam) ("Unlike the regular test of administrative capacity, the short test does not require the employee to 'customarily and regularly' exercise discretion and independent judgment."); *O'Dell v. Alyeska Pipeline Serv. Co.*, 856 F.2d 1452, 1454 (9th Cir.1988) ("Under the Short Test, O'Dell's job must only '*include* [ ] work requiring the exercise of discretion and independent judgment' to qualify him as an exempt employee."); *Donovan*, 725 F.2d at 581 n. 4 (stating that "the short test uses the more liberal standard that an employee's primary duty 'include' work requiring the exercise of discretion and inde-

pendent judgment"). This interpretation is based upon a straightforward reading of the regulations. Perhaps because of an oversight, the Sixth Circuit's decisions imposing the "customarily and regularly" requirement on the short test, without any articulated rationale, stand alone. Nonetheless, this Court is bound to follow Sixth Circuit precedent and therefore must adhere to the "customarily and regularly" requirement.

"[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). The determination of whether an employee exercises discretion and judgment must take into consideration all of the facts involved. 29 C.F.R. § 541.207(b). This requirement is not met if the employee merely applies his skills or follows procedures in making a decision or the decisions do not concern matters of significance. *Id.* However, it is not necessary that the employee is the final decisionmaker. "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(e).

Schaefer contends that he does not customarily and regularly exercise discretion and independent judgment because his decisions regarding the manner of shipping radioactive materials are strictly controlled by DOT and NRC regulations as well as AEP's internal procedures. In addition, Schaefer contends that he has no discretion in deciding where to send radioactive waste because that decision is controlled by the contracts AEP has with its processors. Schaefer argues that his job merely involves the use of his knowledge or skills in determining whether the particular standard or regulation is met.

While Schaefer's argument seems appealing, it must be rejected because it could apply to almost anyone in the nuclear power industry. For good reasons, that industry is heavily regulated and it would be expected that most persons working within the industry must perform their jobs pursuant to applicable government regulations or internal plant procedures. Simply because there are tight controls on a person's work, however, does not mean that the person does not exercise discretion and independent judgment. Although regulations and procedures must be followed, they do not govern every aspect of proper shipping and there are gaps between what the regulations prescribe and their real-world application, such as, for example, the proper method of blocking and bracing a particular load, which calls for the exercise of judgment and discretion. Schaefer exercises discretion and independent judgment in other aspects, such as in completing condition reports. As part of his responsibilities in completing those reports, Schaefer must ensure that an adequate investigation is performed and formulate a proposed corrective action to address the situation. According to Schaefer, those reports may consume between ten and twenty percent of his time. Schaefer also exercises discretion and independent judgment in other areas, although perhaps on a less-frequent basis. For example, he often collects information through benchmarking and makes recommendations regarding a particular alternative.

Schaefer's position cannot be compared to a "grader" or "examiner", positions which the regulations describe as requiring the exercise by the employee of skill rather than discretion and independent judgment. Many of the situations with which Schaefer must deal are unique or unusual, as in the case of a grader of commodities for whom there are no recognized or established standards. *See* 29 C.F.R.

§ 541.207(c)(4). The Court concludes that the record establishes that Schaefer "regularly and customarily" exercises discretion and independent judgment in his employment.

## B. Professional Exemption

■ The first and third elements of the professional exemption are the same as the first and third elements of the administrative employee exemption. To establish this exemption, AEP must also show that Schaefer's work required "knowledge of an advance field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes." 29 C.F.R. § 541.3(a). The regulations indicate that the requisite knowledge must be of an advanced type, "which cannot be attained at the high school level." 29 C.F.R. § 541.301(b). In addition, the knowledge must be in a field of science or learning, as opposed to the mechanical arts. 29 C.F.R. § 541.301(c). In most cases where this exemption is applicable, specific academic training, such as a law degree, is necessary for entrance into the profession. 29 C.F.R. § 541.301(d). Some well-recognized examples of the positions meeting this exemption are lawyers, doctors, nurses, accountants, engineers, architects, and teachers. 29 C.F.R. § 541.301(e)(1). The regulations recognized that "[t]he areas in which professional exemptions may be available are expanding"; however, persons within this exemption still "must be more than highly skilled technicians." 29 C.F.R. § 541.301(e)(2).

The Court concludes that Schaefer's position does not meet the requirements of the professional exemption because it is not the type of position that "must be customarily acquired by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.301(c). Although Schaefer has an Associates of Applied Science Degree in nuclear power technology, AEP has not shown that the degree is necessary for someone to perform Schaefer's position. In contrast, in *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737 (6th Cir.2000), the court held that the plaintiff, a licensed funeral director and embalmer, fell within the professional exemption because the plaintiff was required to be licensed by the state and a year of mortuary science school and two years of college in various subjects were required. *Id.* at 742; *see also Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 524–25 (5th Cir.1999) (stating that in Texas athletic trainers must be licensed and are required to meed certain education requirements in specialized areas). Therefore, Schaefer does not fall within this exemption.

## IV. *Conclusion*

For the foregoing reasons, the Court will deny Schaefer's motion for summary judgment and grant AEP's motion for summary judgment.

An Order consistent with this Opinion will be entered.

### *ORDER*

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment (docket no. 38) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment and/or Partial Summary Judgment (docket no. 41) is **GRANTED.**

This case is **closed.**