13-889-cv
Pippins v. KPMG

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2013

(Argued: February 5, 2014    Decided: July 22, 2014)

Docket No. 13-889-cv

———————

KYLE PIPPINS, individually and on behalf of all others similarly situated, JAMIE SCHINDLER, individually and on behalf of all others similarly situated, EDWARD LAMBERT, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

LISA B. FRALEY, ET AL.,

*Plaintiffs*,

— v. —

KPMG LLP,

*Defendant-Appellee.*[*]

———————

_____

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

1

B e f o r e:

LEVAL, CALABRESI, and LYNCH, *Circuit Judges*.

_____

Plaintiffs-Appellants Kyle Pippins, Jamie Schindler, and Edward Lambert, each individually and on behalf of others similarly situated ("plaintiffs") sued Defendant-Appellee accounting firm KPMG LLP for unpaid overtime wages under the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. §§ 201-219. The United States District Court for the Southern District of New York (Colleen McMahon, *Judge*) granted KPMG's motion for summary judgment on the ground that plaintiffs, employed as entry-level accountants, were learned professionals exempt from the FLSA's overtime provisions under 29 U.S.C. § 213(a)(1). As the record reveals that plaintiffs were employed in a field of science and learning, that they relied on knowledge customarily acquired by prolonged specialized instruction, and that their work involved consistent exercise of professional judgment, see 29 C.F.R. § 541.301, we conclude that plaintiffs were learned professionals.

AFFIRMED.

2

JUSTIN M. SWARTZ (Rachel M. Bien, Deirdre A. Aaron, *on the brief*), Outten & Golden LLP, New York, New York, *for* Plaintiffs-Appellants.

CARTER G. PHILLIPS (Michael C. Kelley, Jennifer Altfeld Landau, Eric D. McArthur, Eamon P. Joyce, *on the brief*), Sidley Austin LLP, Washington, DC, *for* Defendant-Appellee.

GERARD E. LYNCH, *Circuit Judge*:

The Fair Labor Standards Act ("the FLSA"), 29 U.S.C. §§ 201-219, protects "the minimum standard of living necessary for health, efficiency, and general well-being of workers." Id. § 202(a). To this end, the FLSA mandates, inter alia, that employers pay additional compensation at a higher rate to employees who work more than forty hours per week. Id. § 207(a)(1). However, the FLSA exempts employees employed "in a bona fide . . . professional capacity" from its overtime provisions. Id. § 213(a)(1). Department of Labor regulations require that, to qualify for the "learned professionals" exemption, "an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). This case requires us

3

to determine whether junior employees at a major accounting firm who received substantial specialized education as accountants, were designated as accountants by their employer, performed entry-level accounting tasks, and are automatically promoted to a more senior accounting position after two years of satisfactory employment qualify for the learned profession exemption. We hold that they do, and thus are exempt from the FLSA's overtime requirements.

## BACKGROUND

Plaintiffs-appellants Kyle Pippins, Jamie Schindler, and Edward Lambert ("plaintiffs") were employed as "Audit Associates" by their former employer, defendant-appellee KMPG LLP. They brought this action in the United States District Court for the Southern District of New York, on behalf of themselves and others similarly situated, alleging that they regularly worked more than forty hours per week yet did not receive overtime compensation as required by the FLSA. KPMG argued that because plaintiffs worked as accountants, one of the learned professions specifically identified in the regulations as "a field of science or learning," id. §§ 541.301(c), (e)(5), they were exempt from the FLSA overtime provisions, and thus were not entitled to overtime compensation.

4

The District Court (Colleen McMahon, *Judge*), in a thorough and thoughtful 51-page opinion, concluded that because plaintiffs were employed as accountants, a profession in a field of advanced science and learning, deployed knowledge that is customarily acquired by a prolonged course of specialized education, and exercised professional discretion and judgment, they were exempt from the FLSA provisions.  It thus granted KPMG's motion for summary judgment, denied plaintiffs' motion for partial summary judgment, and dismissed pendent state law claims without prejudice.  Plaintiffs timely appealed, and upon de novo review of the district court's grant of summary judgment, Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., --- F.3d ---, ---, 2014 WL 2219162, at *4 (2d Cir. May 30, 2014), we now affirm.

## DISCUSSION

The FLSA excludes from its overtime provisions certain classes of workers, including those employed as "professional[s]."  29 U.S.C. § 213(a)(1).  That exemption requires that the workers' "primary duty . . . be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(a).  The defining regulations impose a three-pronged test to determine

5

whether a primary duty qualifies for the exemption: the work must be (1) "predominantly intellectual in character, and . . . requir[e] the consistent exercise of discretion and judgment," id. § 541.301(b); (2) in a "field of science or learning," which includes accounting, id. § 541.301(c); and (3) of a type where "specialized academic training is a standard prerequisite for entrance into the profession," id. § 541.301(d).

All three prongs must be satisfied for the learned professional exemption to apply, and FLSA exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 222 (2d Cir. 2002), quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). Regarding the application of the exemption to accountants specifically, the regulations elaborate:

> Certified public accountants generally meet the duties requirements for the learned professional exemption. In addition, many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals. However, accounting clerks, bookkeepers and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals.

29 C.F.R. § 541.301(e)(5).

6

Plaintiffs do not dispute that they worked in the field of accounting, and that the second requirement for application of the exemption is satisfied. They contend, however, that the other two requirements are not satisfied, arguing that their work does not require specialized academic training or involve the consistent exercise of advanced knowledge or professional judgment. Plaintiffs contend that Audit Associates receive all the training necessary to perform their function after their arrival at KPMG, rather than through a prior course of intellectual instruction, and that they do not exercise specialized knowledge or professional discretion in performing their duties because they primarily perform low-level, routine work. KPMG responds that Audit Associates, while entry-level, perform tasks that require the informed judgment characteristic of the accounting profession, and rely on skills and knowledge obtained through specialized prior education directed towards professional accountancy accreditation.

I. Standard of Review

On summary judgment we "review [the] district court's grant of summary judgment de novo, resolving all ambiguities and drawing all reasonable inferences against the moving party." Swatch Grp., --- F.3d at ---, 2014 WL

2219162, at *4. We will affirm only if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Id, quoting Fed. R. Civ. P. 56(a).

"The exemption question under the FLSA is a mixed question of law and fact. The question of how the employees spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (citation, internal quotation marks, alterations, and ellipses omitted).

In this case, our inquiry is greatly simplified by the lack of disagreement between plaintiffs and KPMG regarding the types of tasks performed by Audit Associates. Both sides agree that Audit Associates are the most junior members of engagement teams, which produce auditor's reports containing, most critically, the auditor's opinion. Both sides further agree that, in line with their junior status, Audit Associates perform the lowest-level audit tasks, receiving instruction and supervision from senior members of the teams, and that Audit Associates' contributions to audit reports are reviewed and processed by more senior members of the audit team hierarchy before being assimilated into final

8

audit report products. The Audit Associates' typical duties consist of inventory observation (the counting, recording, and checking of client's physical inventory), walkthroughs (reviews with clients of the clients' procedures for financial reporting), and preparation of work papers (documents which enumerate the audit process and review client controls). Audit Associates are typically promoted to Senior Associate after two years of satisfactory service.

Thus, the parties agree that Audit Associates' work is primarily concerned with tasks that contribute to the production of work product – audit opinions – characteristic of the profession of accountancy. What the parties dispute is whether Audit Associates' work is so "pre-determined, " Appellant's Br. at 10, and whether supervision and review of work product by more senior members of KPMG is so pervasive that Audit Associates never exercise the professional judgment characteristic of accountancy.

Similarly, the parties essentially agree on the educational requirements nominally demanded by KPMG, and on the educational qualifications actually possessed by the Audit Associates KPMG hires. Nor is there any dispute about the nature of the training KPMG provides to newly hired Audit Associates; the training materials are set forth in the record. What the parties dispute is the

9

extent to which the training, or the work actually performed by Audit Associates, was based on or required the educational background possessed by those hired for the job.

While the plaintiffs labor strenuously to turn these remaining disputes into issues of fact that preclude summary judgment, they are not. The tasks performed by and educational requirements expected of the plaintiffs and other Audit Associates are essentially agreed by the parties; what is in dispute is whether those tasks "exclude[] them from the overtime benefits of the FLSA[, which] is a question of law." Ramos, 687 F.3d at 558, quoting Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986). We thus turn to that question.

II.     Work Requiring Advanced Knowledge

A.     The Advanced Knowledge Requirement

We have not yet had occasion to elaborate on the meaning of the "advanced knowledge" prong of the learned professional exemption. The relevant regulation states that the requirement that professional work demands advanced knowledge is satisfied when the work is "predominantly intellectual" in character and "require[s] the consistent exercise of discretion and judgment, as

10

distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). Such work is "generally" characterized by the use of advanced knowledge "to analyze, interpret or make deductions from varying facts or circumstances." Id.

As the regulation explicitly identifies "certified public accountants" and those who "perform similar job duties" as learned professionals, id. § 541.301(e)(5), if the plaintiffs actually worked in such a capacity, there is little doubt their work was "predominantly intellectual" for the purposes of the exemption. See Hendricks v. J.P. Morgan Chase Bank, N.A., 677 F. Supp. 2d 544, 553 (D. Conn. 2009) (noting that if plaintiffs were "in fact, [working as] bona fide professional accountant[s], then there is little doubt that the professional exemption applies"). The regulation cautions, however, that "accounting clerks, bookkeepers, and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals." 29 C.F.R. § 541.301(e)(5). Plaintiffs contend that their work is merely routine, and that they do not exercise the kind of discretion and judgment requisite for the exemption.

The nature of "discretion and judgment" in the context of the professional

11

exemption does not receive further elaboration in the regulations, though the parallel requirement of "discretion and independent judgment" in the administrative work exemption to the FLSA, id. § 541.200(a)(3), is described in further detail, id. § 541.202. We have considered that aspect of the administrative work exemption, and concluded that in that context, the deployment of discretion and judgment is manifested by the "authority to formulate, affect, interpret, or implement [the employer's] management policies or its operating practices," by "involv[ment] in planning [the employer's] long-term or short-term business objectives," or by the carrying out of major assignments or committing major financial resources in the conduct of the employer's business. In re Novartis Wage & Hour Litig., 611 F.3d 141, 155-56 (2d Cir. 2010), abrogated on other grounds by Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156 (2012). In interpreting the meaning of "discretion and judgment" in the professional exemption context, two of our sister circuits have, at least implicitly and without much discussion, imported elaboration of the similar term in the administrative work exemption. See De Jesús-Rentas v. Baxter Pharm. Servs. Corp., 400 F.3d 72, 74 (1st Cir. 2005); Rutlin v. Prime Succession, Inc., 220 F.3d 737, 743 (6th Cir. 2000).

We conclude, however, that the a worker's application of broad discretion in the course of general corporate decision-making is of a different character than the professional discretion based on expertise in a particular field that is characteristic of the learned professions. In the context of administrative work, the standard serves to identify, from among the many workers whose jobs could generally be characterized as "administrative," those who perform duties primarily directed towards "management or general business operations," 29 C.F.R. § 541.200(a)(2). See In re Novartis, 611 F.3d at 156 (identifying as indicative of the "discretion and independent judgment" of the administrative work exemption the "authority to negotiate and bind [a company] on any significant matters, or . . . authority to waive or deviate from [the company's] established policies and procedures without its prior approval"). Learned professionals, however, particularly those working for firms that provide professional services to other businesses, need not exercise management authority to operate as professionals; what matters is whether they exercise intellectual judgment within the domain of their particular expertise.

Moreover, as the Seventh Circuit has recognized, the language of the two sections is differentiated in that the administrative workers must show

13

"*independent* judgment" to qualify for the exemption, while the definition of the learned profession exemption omits that adjective. Piscione v. Ernst & Young, L.L.P, 171 F.3d 527, 535-36 (7th Cir. 1999), quoting 29 C.F.R. § 541.207(d)(1). Federal courts that have addressed whether workers designated as accountants qualify as learned professionals have asked whether those workers applied accounting knowledge to exercise discretion and judgment. See, e.g., Hendricks, 677 F. Supp. 2d at 553 (basing an inquiry of if a worker was an accountant for the purposes of the professional exemption by considering "the application of accounting knowledge and the use of discretion and judgment"); In re KPMG Wage & Hour Litig., No. CV 07-4396-JFW (CWx), 2012 WL 5416939, at *8 (C.D. Cal. Oct. 19, 2012) (considering worker's deployment of judgment and discretion to determine if she worked as accountant).

Most importantly, the Secretary of Labor has recognized that the discretion and judgment standard for the professional exemption is "less stringent" than the discretion and independent judgment standard of the administrative exemption. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, the Preamble to the 2004 Final Rule, 69 Fed. Reg. 22122, 22151 (April 23, 2004). Unlike the managerial

14

decision-making typical of the administrative exemption, the professional exemption is characterized by "appl[ication] [of] special knowledge or talents with judgment and discretion." Id., quoting 29 C.F.R. § 541.305(b). While "the Department of Labor's interpretations of its own regulations are not binding and do not have the force of law, . . . we will generally defer to an agency's interpretation of its own regulations so long as the interpretation is not plainly erroneous or inconsistent with the law." Ramos, 687 F.3d at 559 (citation, internal quotations marks, and ellipses omitted). Thus, while the administrative exemption may provide helpful guidance in identifying some of the characteristics of professional discretion and judgment, we decline to apply the administrative exemption standard uncritically to the learned profession exemption.

With this background in mind, we turn to the substance of the professional exemption's advanced knowledge requirement. While there is a lack of precedent in this circuit on the topic, the decisions of other courts provide considerable guidance for analyzing 29 C.F.R. § 541.301(a).

Central to the advanced knowledge inquiry are "the importance of the duties, the frequency with which they require the employee to exercise

15

discretion, and the relative freedom of the employee from supervision, as well as the percentage of time the employee spends performing them." Piscione, 171 F.3d at 545. A review of the most analogous cases suggests that workers apply discretion in the application of advanced knowledge when they interpret and analyze information central to the practice of the profession.

For example, in concluding that a human resources consultant who dealt with financial planning and performed "both routine and complex tasks . . . [and] frequently . . . exercise[d] discretion with regard to the analysis of data," id. at 545, was a learned professional, the Seventh Circuit stated that "[a]n employee may be required to collect information, but would still be within the professional exemption if he had to interpret that data as well." Id. at 543. The Sixth Circuit similarly stated that pharmacists who "analyze[d], approve[d], and fill[ed] prescription requests" were learned professionals, even when guided by standardized instructions, so long as they "maintain[ed] discretion to decide when to depart from the [standard operating procedures]" in the service of patient health. De Jesús-Rentas, 400 F.3d at 76.

Other circuits have found that the learned professional exemption applied to workers who made independent decisions even if they were expected to

follow established guidelines and standards.  See, e.g., Owsley v. San Antonio

Indep. Sch. Dist., 187 F.3d 521, 526-27 (5th Cir. 1999) (athletic trainers learned

professionals when they could make immediate decisions regarding treatment

and medical condition of athletes); Rutlin v. Prime Succession, Inc., 220 F.3d 737,

742-43 (6th Cir. 2000) (director of funeral home learned professional because he

made decisions regarding treatment of bodies, supervision of funerals, and

embalming process).  Thus, the application of advanced knowledge take one of

two forms: substantive interpretation of data (as in Piscione and De Jesús-

Rentas); or meaningful decision-making capacity, even if only over relatively

quotidian decisions, characteristic of a member of the profession (as in Owsley

and Rutlin).

Such cases also provide useful guidance on the attributes of a job that do

*not* deprive a worker of the discretion and judgment characteristic of a learned

professional.  "Even if an employee's responsibilities require her to engage in

some routine work, the position may be classified as coming within the

professional exemption."  Piscione, 171 F.3d at 543.  See also Rutlin, 220 F.3d at

738-39 (worker found to be learned professional on summary judgment even

where duties included "chores such as receiving and directing flower deliveries,

17

arranging for newspaper notices, mowing the lawn, and cleaning the funeral home"). Thus, the fact that Audit Associates spent some time performing "non-judgmental" or "clerical and administrative" tasks, Appellant's Br. at 13, does not in itself defeat their classification as learned professionals.

Similarly, workers may be found to exercise professional judgment even when their discretion in performing their core duties is constrained by formal guidelines, or when ultimate judgment is deferred to higher authorities. In De Jesús-Rentas, pharmacists were found to exercise discretion and judgment despite working under the guidance of "Standard Operating Procedures," because they exercised discretion to deviate from the procedures, and because they participated in the creation of the guidelines. 400 F.3d at 76. Similarly, in Owsley athletic trainers did not lack discretion and judgment even though they generally performed their duties within "standard treatment guidelines" and "act[ed] under the supervision and the direction of the team physician." 187 F.3d at 526. Because there was no "immediate expectation of physician intervention" and "no evidence that the physicians supervise the trainers' activities at all times, or even most of the time," the trainers exercised discretion through making discrete decisions dependent on specialized knowledge. Id. at 527.

18

The same decisions also inform the distinct meaning of "work requiring advanced knowledge" in the learned professions exemption. The plaintiffs in those cases – all decided on summary judgment – were all deemed to deploy advanced knowledge because their work involved decision-making characteristic of the role of a member of the particular profession at issue. The funeral director in <u>Rutlin</u>, for example, was deemed to exercise discretion in the acts of running a funeral home and embalming bodies – the tasks required of a professional "in his field." 220 F.3d at 743. Likewise, the athletic trainers in <u>Owsley</u> made the types of sports medicine decisions that might be expected of athletic trainers, and the pharmacists in <u>De Jesús-Rentas</u> used their specialized knowledge of chemistry and pharmacology to determine when a prescription might harm patient health – precisely the type of judgment one might expect pharmacists to make in their professional capacity. Thus, unlike the administrative exemption, where the exercise of discretion requires engagement with "management policies or operating practices," or other conduct typical of business management, <u>In re Novartis</u>, 611 F.3d at 155, the professional exemption requires the exercise of judgment characteristic of the learned profession at issue.

Thus, we take from our sister circuits' decisions the sensible proposition

19

that the learned professions exemption applies if workers rely on advanced knowledge of their specialty to exercise discretion and judgment that is characteristic of their field of intellectual endeavor. This interpretation accords with the plain language of the regulations as well as with the Supreme Court's instruction that the FLSA's "emphasis on the capacity of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works," Christopher, 132 S. Ct. at 2170 (internal quotation marks omitted), and the Secretary of Labor's "continu[ed] . . . agree[ment] that a prime characteristic of professional work is the fact that the employee does apply his special knowledge with discretion and judgment," Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22151, quoting 29 C.F.R. § 541.305(b) (internal quotation marks omitted).

B.     Advanced Knowledge in the Profession of Accounting

Because it is explicitly identified as such, 29 C.F.R. §§ 541.301(c), (e)(5), we need not inquire whether accountancy has a sufficiently intellectual character to qualify as a learned profession. We must still, however, identify what qualities are characteristic of the work of an accountant.

There is little case law describing the nature of the professional discipline of accountancy. There appears to be little dispute, however, that central to the profession is the application of "appropriate professional skepticism . . . an attitude that includes a questioning mind and a critical assessment of audit evidence and requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred." In re KPMG Wage & Hour Litig., 2012 WL 5416939, at *7, quoting Generally Accepted Auditing Standards (GAAS) AU § 316.12 (internal quotation marks, ellipses, and brackets omitted). Thus, in order to qualify as professional accountants, the "primary duty," 29 C.F.R. § 541.301(a), of workers must be the deployment of such skepticism to ensure the integrity of the financial accounting process, and their individual tasks must typically involve the exercise of such professional skepticism. However, the merely occasional exercise of such professional judgment, which does not constitute a primary duty, will not suffice. See Hendricks, 677 F.Supp. 2d at 553-54. Nor will a worker who deals with the tabulation of data demonstrate professional skepticism merely by noting and reporting irregularities or errors in the process of tabulation. See Brock v. Nat'l Health Corp., 667 F.Supp. 557, 567 (M.D. Tenn. 1987) ("Any ordinary bookkeeper

21

would make inquiries about abnormalities in the ledgers.").

Thus, the "professional skepticism" indicative of the profession of accounting consists of a substantive attention to, and awareness of, the content of audit and financial materials, and the duty and ability to identify irregularities therein. A worker demonstrates professional skepticism as an accountant, and therefore exercises the discretion and judgment of a professional, when in the performance of audit- and accountancy-related tasks, the worker is expected to be specially and knowledgeably attentive to the possibility of accounting impropriety or financial irregularity. This quality is akin to the duty to perform interpretation or analysis of data identified as characteristic of the learned professions by our sister circuits, particularly in Piscione and De Jesús-Rentas.

C.     The Work of Audit Associates

As discussed above, there is no dispute that Audit Associates at KPMG perform work central to the execution of audits – inventory observations, walkthroughs, and preparations of work papers that review audit procedures and client controls. Plaintiffs acknowledge that Audit Associates are expected to practice "professional skepticism" in the discharge of these duties, but argue that they "understood professional skepticism to mean bringing any errors to the

22

attention of more senior team members, taking care in performing their work, being professional in communication, asking questions and not doing something 'mindlessly', and acting in a 'conservative and ethical manner.'" Appellant's Br. at 14-15. However, the plaintiffs' characterization of the professional skepticism expected from them, which seeks to minimize their use of advanced knowledge and exercise of judgment and discretion, has little bearing on our inquiry. The critical question, rather, is whether the undisputed facts demonstrate that Audit Associates practice professional skepticism, in the sense of the judgment characteristic of accountants.

Plaintiffs do not dispute that the types of foundational accounting tasks the Audit Associates perform would require the employment of advanced knowledge of accounting were they performed with sufficient independence.[2] Rather they argue that the circumstances in which Audit Associates performed

---

[2] That Audit Associates perform these core accounting tasks of walkthroughs, inventory observations, and testing controls differentiates this case from two district court cases which found financial workers to not to be accountants. The plaintiffs in both Hendricks, 677 F. Supp. 2d at 553, and Brock, 667 F. Supp. at 560, worked primarily with documents and had little client contact, reviewing financial statements and performing data entry on logs. There is no argument nor evidence here that the Audit Associates are primarily employed in such a bookkeeper-like capacity.

23

these tasks deprived them of the discretion that would require use of this advanced knowledge. To support that argument, plaintiffs cite two attributes of Audit Associates' actual employment: that most of their work is routine, with heavy dependence on guidelines and templates, and that there is pervasive supervision culminating in the extensive review of any work product.

Plaintiffs argue that their work is devoid of any application of specialized skill or knowledge, and that KPMG's instructions reduce any complex task to routine increments. Thus, they claim that Audit Associates do no more than rely on "common sense," Appellant's Br. at 11, 30, 43, to identify possible risks or "unusual transactions," J. A. at 2082. Rather than exercise any discretion, the Audit Associates "simply perform the audit steps that are assigned to them." Id. at 2032. Plaintiffs further state that the observations central to the performance of Audit Associates' duties are "obvious," id. at 2012 ("It is obvious when inventory is stale or obsolete."), and that "Audit Associates do not review or consider the audit evidence they gather," id. at 2032.

In denigrating the work performed by Audit Associates, plaintiffs rely heavily on the effect of the resources available to them – including templates, a computer program that provides guidance on the audit steps, and prior work

24

papers, which Audit Associates are expected to review and update – which are expected to homogenize both the auditing process and their work product. They further argue that the actual steps Audit Associates perform – "filling out template form[s]," obtaining client documentation and interviewing clients regarding it, and documenting those activities – are not sufficiently intellectual in character to reflect the exercise of discretion. Appellant's Br. at 33; J. A. at 2069.

Certainly, there can be no dispute that, as the most junior level members of the accounting hierarchy, Audit Associates are "entry level employees who lack" the "extensive experience" possessed by more senior members of audit teams, J. A. at 2060, and thus are more likely to rely on the guidance of reference materials. It does not follow, however, that because they are the most junior members of the team, they fail to rely on an advanced knowledge of accountancy. Indeed, the facts presented by plaintiffs indicate a role for Audit Associates that undermines the plaintiffs' trivializing characterization of their work.

Contrary to plaintiffs' assertion that they *never* employ advanced knowledge in their work, the agreed-upon facts make evident that judgment of the type characteristic of trained accountants is at least sometimes a part of Audit Associates' work. Plaintiffs admit that "Audit Associates may, at times, be the

25

only member of the engagement team present for a less complicated inventory observation." Id. at 2062. Moreover, plaintiffs assert that "[a]pproximately eighty percent of the time, the in charge of the overall audit is a Senior Associate," and that "First-year Audit Associates serve as the in-charge of the overall audit between 0 to 5 percent of the time." Id. at 2099.[3] That even first-year Audit Associates fulfill these roles as part of KPMG's typical practice undermines the blanket statements regarding the level of rote guidance and micromanagement associated with their work. Furthermore, that Audit Associates regularly serve as the only member of an audit team present for an inventory observation or are on occasion designated as in-charge of an audit refutes plaintiffs' claims of constant supervision.

More important than the fact that Audit Associates occasionally occupy leadership roles is that a review of their more typical tasks reveals that they regularly rely on advanced knowledge of accountancy, and practice the judgment and discretion characteristic of their profession. Plaintiffs argue that Audit Associates do not "draw conclusions" or "determine sufficiency of audit

_____

[3] The "in-charge" is the audit team member expected to be the "day-to-day operator" of an audit engagement.

26

evidence" in the performance of their duties. Id. at 2067-68; see also Appellant's Br. at 39 (Audit Associates' "primary duty [does] not include designing or determining procedures, deciding what methods to use, making decisions related to tests, or determining materiality"). But Audit Associates' work consists of tasks such as "testing controls [which] involves obtaining a list of the client's controls and redoing the steps," which itself "entails filling out a template form located on KPMG's system and inputting information onto it," or performing walk-throughs, which the plaintiffs describe as consisting of five distinct steps such as interviewing clients and seeking supporting documentation to assess client controls, then documenting the process in work papers, J. A. at 2069. In describing the production of such work papers, one of the essential products produced by Audit Associates, plaintiffs assert that Audit Associates merely "document the results" of assessing "client's control process," but do not "reach conclusions about the effectiveness of those controls." Id. at 2078. Plaintiffs describe this documentation process as the result of "going through the audit steps." Id. at 2074.

Plaintiffs' effort to characterize their work as not employing advanced knowledge because each specific step taken in the performance of accounting

27

duties was, in isolation, a narrow and discrete task fails to persuade. The tasks performed by Audit Associates are the quintessential activities that form the basis for an audit opinion, KPMG's main product. That the tasks can be broken down into component parts, and that junior accountants are provided with step-by-step instructions for performing their functions effectively does not mean that in performing these tasks Audit Associates do not demonstrate the professional skepticism and trained intellect that is characteristic of professional accountants. Breaking down tasks into their component parts so that they can be described in the most banal way possible obscures the judgment that is called for in determining if workers are learned professionals. Thus, the diagnostic process of even the most skilled physician can be described as speaking with patients, examining their bodies, and recording the resulting observations; online protocols and checklists are available to structure interviews and observation and to identify factors relevant to diagnosis and treatment, and such devices may be especially useful to a doctor at the beginning of her career. Such facts hardly suggests that the doctor is not acting as a medical professional, that the use of advanced knowledge and exercise of professional judgment is not involved in making the necessary observations and deciding whether those observations

28

match criteria in a textbook, or that someone without the professional training would be able to perform the same tasks as successfully simply by following the protocols and instructions in a rote fashion.

What counts is the application of professional judgment to the observations that are made. Plaintiffs admit that Audit Associates must bring a "questioning mind," Id. at 2058, to the performance of their duties; the exercise of such questioning, informed by the mindset of a trained accountant (a training to which we return in discussing the educational requirement below), utilized in the performance of core accounting tasks, is the very definition of the professional skepticism of an accountant. Plaintiffs' own description of their work indicates that they collected and analyzed information from clients and produced written work product requiring judgment analogous to that exercised by the pharmacists in De Jesús-Rentas and the financial manager in Piscione, and that the Audit Associates did more than tabulate data or maintain books.

Plaintiffs' fundamental error is to confuse being an entry-level member of a profession with not being a professional at all.[4] Audit Associates are the most

---

[4] It is worth noting in this respect that "Audit Associate" is a rung on a ladder to the higher reaches of the profession, not a separate job classification into which less highly-trained or highly-skilled applicants are hired and in which they are

29

junior members of the team, and it is hardly surprising that they do not make high-level decisions central to KPMG's business. Yet unlike the administrative worker or executive exemptions to the FLSA, the learned profession exemption does not require that the professional reach conclusions that guide or alter the course of business. The critical question is whether the workers act in a manner that reflects knowledge and requires judgments characteristic of a worker practicing that particular profession. Here, by testing controls, performing inventory reviews, and ultimately replicating the audit process in each work paper, Audit Associates clearly did so by engaging with the audit process in a critical manner.

The junior status of Audit Associates explains the existence of guidelines and supervision to assist their work. A professional firm understandably uses guidelines and protocols of various kinds to provide training and structure for novice employees, and to indicate how they should perform their duties.[5] The

expected to remain. The record is clear, and the sides do not dispute, that Audit Associates who meet expectations are routinely promoted to Senior Associate after two years.

[5] Indeed, even experienced professionals, from airline pilots to surgeons, utilize checklists and standardized protocols in order to improve their performance and avoid mistakes.

caselaw makes clear that the utilization of such guidelines does not remove the professional quality from work that requires specialized knowledge, where that specialized knowledge pervades the performance of the work, and the workers, when they observe a situation or fact beyond the bounds of normal procedures, must take action that deviates from the guidelines. See De Jesús-Rentas, 400 F.3d at 76 ("Appellants admit that their ultimate duty is to assure patient health, and that they depart from the [standard operating procedures], if necessary, to meet this responsibility. Thus, appellants maintain discretion to decide when to depart from the [standard operating procedures]."); Owsley, 187 F.3d at 527 ("existence of standard procedures and guidelines" did not deprive athletic trainers of the need to "make decisions about problems to which there were often no recognized or established answers," and they thus exercised professional discretion (internal quotation marks omitted)). That is precisely the role expected of Audit Associates – performance of tasks which may be significantly predetermined, but with a perpetual diligence founded in specialized knowledge that can compel informed deviation from such guidelines.

Plaintiffs' argument regarding the impact of the supervision and review of Audit Associates' work product by more senior accountants is similarly

unpersuasive.  Plaintiffs assert that, in their reviews of client controls, Audit

Associates do no more than "pass on the information they obtain in work papers

to more senior team members who reach conclusions and make determinations

with respect to that information."  J. A. at 2082.  Supervision of junior

professionals by more experienced senior colleagues is normal in many

hierarchically organized professional firms and institutions, from hospitals to law

firms to investment banks.  Such supervision ensures quality work for clients and

provides training and feedback to the less experienced professionals, and does

not relegate the junior professionals to the role or status of non-professional

staff.[6]  Even by the plaintiffs' own description, supervision does not deprive

Audit Associates of the need to assiduously and consistently apply the

skepticism characteristic of the accounting profession.

Plaintiffs' argument that Audit Associates lack discretion because they are

expected to seek guidance or supervision from more senior colleagues "if

evidence obtained is conflicting, key evidence is not available, [Audit Associates]

---

[6]  Indeed, hierarchical review is admittedly universal at KPMG, which, "adheres
to audit standards that require appropriate supervision and review of the work
of assistants — who are everyone other than the lead partner."  J. A. at 2101.  That
"[a]ll work that is prepared by Audit Associates is reviewed by another member
of the engagement team," id., reflects this policy.

lack experience or expertise in a subject matter, they don't understand why a procedure is being performed, or 'something just does not 'feel right,'" Appellant's Br. at 16 (brackets in original omitted), misconceives the nature of professional judgment. As in De Jesús-Rentas and Owsley, Audit Associates must deploy advanced knowledge and practice professional judgment precisely in order to identify the unique circumstances that necessitate seeking further advice. Accepting plaintiffs' assertion that "KPMG requires Audit Associates to bring every error or anomaly that they encounter to the attention of a more senior team member who tells them what to do," J. A. at 2058-59, the identification of errors or anomalies during the audit process itself is an exercise of accounting knowledge and professional judgment that a non-accountant would not possess. It is a hallmark of informed professional judgment to understand when a problem can be dealt with by the professional herself, and when the issue needs to be brought to the attention of a senior colleague with greater experience, wisdom, or authority.

Most centrally, plaintiffs offer no facts or arguments to explain how Audit Associates could have acted as anything other than accountants in performing the review of client procedures and producing the work papers, foundational

33

duties in the production of audit reports. Plaintiffs' characterization of the review of Audit Associates' work depends upon an arbitrary distinction between Audit Associates who do no more than "obtain and document" information when they gather information and produce work papers, and their supervisors who, in their review of such work papers, "reach conclusions and make determinations." Id. at 2074. We are unpersuaded by the argument that when Audit Associates consider evidence which they themselves have collected to produce work papers, they perform only a rote process, but that when more senior members of the audit team review the same work papers, their exertions, however rooted in greater experience and sophistication, suddenly becomes the work of an entirely different profession. The Department of Labor Regulations distinguish between those who "perform similar job duties" to certified public accountants, who may qualify as learned professionals, and mere "accounting clerks, bookkeepers, and other employees who normally perform a great deal of routine work," who generally will not. 29 C.F.R. § 541.301(e)(5). We have little difficulty finding that Audit Associates fall into the former category.

To the extent plaintiffs argue that their various contentions raise disputed issues of fact requiring denial of summary judgment, they misconceive the nature

34

of the inquiry. As we noted above, what plaintiffs do on the job is a question of fact, Ramos, 687 F.3d at 558, and in this case there is no dispute about that. "[W]hether their particular activities exclude[] them from the overtime benefits of the FLSA," however – in this case, whether plaintiffs' duties satisfy the advanced knowledge requirement of the learned professional exemption – is a question of law. Id., quoting Icicle Seafoods, 475 U.S. at 714. The various arguments we have considered and rejected do not present issues of fact. They are not arguments about what plaintiffs do, but about how what they do should be characterized in light of established legal criteria. The district court appropriately addressed those arguments, and correctly concluded that plaintiffs' admitted job responsibilities call for the advanced knowledge of, and the exercise of professional judgment and discretion characteristic of, a trained accountant.

III.    A Prolonged Course of Specialized Intellectual Instruction

That Audit Associates exercise discretion and judgment in the performance of their duties satisfies only one of the two disputed requirements. To be classified as learned professionals, plaintiffs must also employ advanced knowledge of accounting that is "customarily acquired by a prolonged course of specialized intellectual instruction," 29 C.F.R. § 541.301(b). Plaintiffs argue that

while the core accounting education Audit Associates generally received "might be *helpful* to . . . entry-level Audit Associate[s], [such education was] not *necessary* to allow them to perform their work." Appellant's Br. at 47. They contend that Audit Associates learn the skills they need through initial training and on-the-job instruction provided by KPMG.

As with the "advanced knowledge" issue, we find little guidance in our own case law about the parameters of the education requirement. However, the treatment of the education requirement by other circuits – which we find persuasive – indicates that the requirement will usually be satisfied by a few years of relevant, specialized training, and suggests that a bachelor's degree in a germane field suffices. See, e.g., Reich v. Wyoming, 993 F.2d 739, 741 (10th Cir. 1993) (educational prong satisfied where game wardens "required to have a baccalaureate degree in wildlife management, wildlife biology, or a closely related field"); Rutlin, 220 F.3d at 742 (two years of college including related scientific training, year of mortuary science school, and passage of state examination deemed sufficient); Owsley, 187 F.3d at 524 (bachelor's degree in any field, five 3-hour credit courses specifically directed towards athletic training, 1800 hours of apprenticeship training, and C.P.R. test deemed sufficient).

In contrast, the requirement will not be satisfied by generic non-specialized educational requirements, see, e.g., Dybach v. Fla. Dept. of Corrections, 942 F.2d 1562, 1565 (11th Cir. 1991) (bachelor's in any field not sufficient to satisfy specialized instruction prong for probation officers), nor by didactic hands-on training, even if specialized and intensive, see, e.g., Vela v. City of Houston, 276 F.3d 659, 675 (5th Cir. 2001) (lack of educational requirement combined with 1080 combined field work and didactic training insufficient to satisfy learned professional prong for emergency medical technicians), nor by a combination of generic education and specialized apprenticeship, see Fife v. Harmon, 171 F.3d 1173, 1177 (8th Cir. 1999) ("combination of experience and education" from "general academic education and from an apprenticeship" insufficient to satisfy education prong for airfield supervisors).

The central facts are not in dispute here. Plaintiffs admit that Audit Associates hired by KPMG are generally required to be either eligible or nearly eligible to become licensed as Certified Public Accountants ("CPAs"), J. A. at 2040, and that in actual fact the "vast majority of Audit Associates had accounting degrees and were eligible to take the CPA exam," Appellant's Br. at

46 n.6.[7]

In Young v. Cooper Cameron Corp., we stated "the word 'customarily' is

key" in assessing satisfaction of the prolonged educational requirement, and then

quoted from the regulation:

> The word 'customarily' implies that in the vast majority
> of cases the specific academic training is a prerequisite
> for entrance into the profession. It makes the exemption
> available to the occasional lawyer who has not gone to
> law school, or the occasional chemist who is not the
> possessor of a degree in chemistry, etc., but it does not
> include the members of such quasi-professions as
> journalism in which the bulk of the employees have
> acquired their skill by experience rather than by any
> formal specialized training.

586 F.3d 201, 205 (2d Cir. 2009), quoting 29 C.F.R. § 541.301(d). Thus, the critical

inquiry is not whether there might be a single Audit Associate who does not

satisfy a specific set of academic requirements, but whether the "vast majority" of

Audit Associates required a prolonged, specialized education to fulfill their role

---

[7] The record reveals Audit Associates' qualifications in more detail – of the 1096 Audit Associates who opted to join this action, 82% have earned either graduate or undergraduate degrees in accounting, and an additional 14% have earned degrees in related fields which establish CPA eligibility. Of the remaining 4%, nearly all have a minor or certificate in accounting, and of the three who did not, two are CPA-eligible via other means and one was already a licensed CPA prior to joining KPMG. J. A. at 1387.

as accountants. In light of their formidable educational qualifications, it is indisputable that the vast majority of Audit Associates received such an education, and we reject plaintiffs' argument that KPMG's willingness to hire "even one Audit Associate who did not have an accounting degree," Appellant's Br. at 47, creates a material fact issue regarding whether Audit Associates "require advanced accounting knowledge."

More substantive, though equally unavailing, is plaintiffs' argument that however well-educated Audit Associates are, their actual work does not call on whatever advanced knowledge they have acquired in their course of study, but only on KPMG's own materials and internal training. Here at least plaintiffs are right on the law: if journalists are not "learned professionals" because they acquire their skills on the job, see Young, 586 F.3d at 205, a newspaper cannot deprive them of overtime pay by arbitrarily setting a PhD in literary studies as a condition of hiring. See also Dybach, 942 F.2d at 1565-66 (where requirement that probation officer have a B.A. degree could be satisfied by "degree in nuclear physics, or be in corrections, or be in physical education, or basket weaving," the degree did not provide a "high degree of specialized training" relevant to the job, and educational requirement for professional exemption could not be satisfied

(internal quotation marks omitted)).  Thus, plaintiffs' argument might be availing if KPMG hired as Audit Associates only candidates who had bachelors' degrees in accounting or the equivalent, but then set them to work in a non-professional capacity to exercise skills that could have been taught to any high school or college graduate via short-term in-house training.

The argument founders on the facts, however.  In light of our conclusion that Audit Associates exercise the discretion and judgment characteristic of the learned professional, the plaintiffs must argue that Audit Associates gain the necessary knowledge to act as accountants through a one-week introductory training course, followed by on-the-job training.  Plaintiffs are unable to raise a genuine issue of fact about this, citing only the conclusory opinion of one of the lead plaintiffs herself that on the job training, not prior knowledge, informed Audit Associates' conduct.  An examination of the training materials in the record makes sufficiently plain that the average classics or biochemistry major could not understand the materials, or develop the requisite understanding of the audit function, on the basis of a brief training period.

We thus conclude that the Audit Associates receive the training necessary to work as accountants through a prolonged course of specialized instruction,

and thus satisfy the final element of the learned professional test. We need not

determine the minimum amount of education necessary to satisfy this

requirement; we hold only that KPMG Audit Associates clearly satisfied it.

IV.    The District Court's Denial of Further Discovery

Finally, plaintiffs argue that summary judgment was premature, and that

they should have been granted further opportunity for discovery. We review the

district court's decision with respect to discovery for abuse of discretion.

Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994). A "trial court

enjoys wide discretion in its handling of pre-trial discovery," and we will

"reverse a district court's discovery ruling only upon a clear showing of an abuse

of discretion." Wills v. Amerada Hess Corp., 379 F.3d 32, 51 (2d Cir. 2004).

Here, the district court proposed limited discovery on the specific issue of

whether the Audit Associates were exempt professionals, before moving on to

further discovery. The judge articulated the relationship between the discovery

plan and the possibility of the case being resolved as a matter of law without

ambiguity:

> It doesn't make sense to go off and do the whole
> entirety of discovery on every issue that could
> conceivably be raised in this case if the case is going to
> end up standing or falling on is there really an issue

41

> about whether these people are professionals . . . it makes the most intuitive sense to me for . . . the propopents of the position that [Audit Associates] fall within an exemption to come forward with their evidence and say . . . as a matter of law these people are professionals.

J. A. at 614-15. Plaintiffs' counsel explicitly approved of this plan. Id. at 615 ("That makes sense to me."). The district court's sensible reasoning, and plaintiffs' agreement with the plan to take limited discovery to resolve a the threshold issue of Audit Associates' status as exempt professionals, supports the conclusion that the district court did not abuse its discretion.

Furthermore, the discovery and subsequent record here has produced sufficient evidence to resolve the threshold issue of the applicability of the professional exemption. Since "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 286 (2d Cir. 2000) (alteration omitted), it is unclear how further evidence might aid plaintiffs. The discovery on the relevant issue here has been "extensive," Contemporary Mission, Inc. v. N. Y. Times. Co., 842 F.2d 612, 622 (2d Cir. 1988), and we cannot conclude that the district court abused its discretion in halting discovery at the time that it did.

**CONCLUSION**

In sum, our review of the case leads to the conclusion that plaintiffs are, in the broad sense as well as through a fine-grained analysis of the Department of Labor regulations, not the type of worker that the FLSA was designed to protect. To adapt a persuasive observation from one of our prior cases, "[t]he FLSA is properly considered a shield to protect unwary workers; it is not a sword by which [professionals] at the pinnacle of accomplishment and prestige in [their profession] may obtain a benefit from their employer for which they did not bargain. . . . [W]e think that the DOL interpretative guidelines should be read in an effort to promote the FLSA's purpose, not to frustrate it." Freeman v. Nat'l Broad. Co., Inc., 80 F.3d 78, 86 (2d Cir. 1996). Our review has demonstrated that Audit Associates, while early in their careers, are precisely the types of professionals the regulations seek to exempt from FLSA – well-compensated professionals at a top national accountancy practice, performing core accountancy tasks.

We thus conclude that, for the purposes of 29 C.F.R § 541.301, Audit Associates are learned professionals who perform work requiring advanced knowledge requiring the consistent exercise of discretion and judgment, and who

43

have customarily received this advanced knowledge through a prolonged course of specialized intellectual instruction. They are thus learned professionals, and exempt from the FLSA overtime requirements. Having found the plaintiffs' other arguments to be without merit, the judgment of the district court is AFFIRMED.